IN THE 148TH DISTRICT COURT
OF NUECES COUNTY, TEXAS

AND

RECEIVED
COURT OF CRIMINAL APPEALS
4/15/2015
ABEL ACOSTA, CLERK

IN THE COURT OF CRIMINAL APPEALS OF TEXAS
IN AUSTIN, TEXAS

|  |  |
|---|---|
| RICHARD VASQUEZ, JR., ) | WRIT NO. _____ |
| ) | |
| APPLICANT. ) | TRIAL COURT NO. 98-CR-0730-E |
| ) | |
| ) | CAPITAL CASE |
| ) | |
| ) | Scheduled Execution Date: |
| ) | April 23, 2015 |

# SUBSEQUENT APPLICATION FOR POST-CONVICTION
# WRIT OF HABEAS CORPUS

Andrew M. Edison
Texas Bar No. 00790629
James M. Chambers
Texas Bar No. 24092240

Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
andrew.edison@emhllp.com
james.chambers@emhllp.com

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................. 6

PROCEDURAL HISTORY ................................................................................... 8

CLAIMS FOR RELIEF ....................................................................................... 10

I.      Mr. Vasquez raises three claims for relief, all of which satisfy the requirements of Article 11.071, Section 5................................................. 10

STATEMENT OF FACTS ................................................................................... 11

I.      Relevant Evidence Admitted at Trial ........................................................ 11

A.      Miranda died from injuries sustained while she was under Mr. Vasquez' care. ..................................................................................... 11

B.      The State presented uncontradicted medical testimony that Miranda's death was the result of blunt force injuries that could only have been caused by child abuse ...................................................................... 13

C.      Without evidence to refute the medical testimony of the State's expert witnesses concerning the cause of death, the defense attempted to refute the implications of the State's evidence regarding Mr. Vasquez's mental state. ............................................................... 15

D.      Current Scientific Medical Evidence, That Was Not Available At the Time of Trial, Contradicts Crucial Testimony of the State's Medical Experts and Establishes That Miranda Died As a Result of the Fall.. 16

1

CLAIM ONE................................................................................................ 19

    I.      Mr. Vasquez is entitled to habeas relief under Article 11.073 because

new scientific evidence shows (1) that he did not cause the death of

Miranda Lopez and (2) contradicts scientific evidence relied on by the

state. ........................................................................................... 19

    A.    Mr. Vasquez is entitled to a decision on the merits of his 11.073

claim. ......................................................................................... 20

    B.    Standard for granting relief under Article 11.073 .............................. 22

    C.    New scientific evidence is available. ...................................... 24

        1.     The Debunking of Shaken Infant Syndrome................................. 25

        2.     New Science on Head Injuries Caused by Falls ........................... 27

        3.     Recent Advances in Biomechanics ....................................... 29

        4.     Second Impact Syndrome.................................................. 31

    D.    The new scientific evidence would be admissible at a trial held

today ...................................................................................32

    E.    The new scientific evidence would have led to a different outcome at

Mr. Vasquez's trial. ................................................................. 33

CLAIM TWO ............................................................................................... 37

II.    Mr. Vasquez is entitled to habeas relief because both his conviction and death sentence are based on evidence that is now known to be false, in violation of his due process rights and Ex parte Cabot. ........................... 37

    A.    Mr. Vasquez is entitled to a decision on the merits of his claim under Chabot. .................................................................................................... 38

    B.    Standard for granting relief under Chabot. ............................................ 38

    C.    The State presented false and misleading expert testimony at Mr. Vasquez's trial. ....................................................................................... 40

    D.    The State's reliance on false evidence to obtain Mr. Vasquez's conviction and death sentence cannot be upheld. ............................... 41

CLAIM THREE ......................................................................................................... 43

III.   Mr. Vasquez is entitled to habeas relief because he is innocent of capital murder. ................................................................................................................. 43

PRAYER FOR RELIEF ........................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Accord Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010) ...................... 39

*Ex parte Chabot,* 300 S.W.3d 768 (Tex. Crim. App. 2009)............................ passim

*Ex Parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012............................ passim

*Ex parte Elizondo*, 947 S.W. 2d 389 (Tex. Crim. App. 1994........................... 42, 43

*Ex parte Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996) ...................................... 39

*Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012) ...................... 29, 30

*Ex Parte Oranday–Garcia*, 410 S.W.3d 865 (Tex. Crim. App. 2013)................... 20

*Ex Parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011) ..................... 38, 39, 40

*Ex Parte Robbins*, No. WR-73,484-02, 2014 WL 6751684

    (Tex. Crim. App. Nov. 26, 2014)................................................................ passim

*Herrerra v. Collins*, 506 U.S. 390 (1993)................................................................ 42

*Holmes v. Court of Appeals,* 885 S.W.2d 389 (Tex. Crim. App. 1994)................. 42

*Vasquez v. Quarterman*, No. CC-05-059, 2008 WL 859147 .................................... 9

*Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001)................................... 8

*Vasquez v. Thaler,* 131 S.Ct. 2445 (2011). ............................................................... 9

*Vasquez v. Thaler*, 389 F. App'x 419 (5th Cir. 010)................................................. 9

**Statutes**

Article 11.071 of the Texas Code of Criminal Procedure ............................ 8, 11, 19

Article 11.073 of the Texas Code of Criminal Procedure ............................... passim

Tex. Crim. Proc. Code Ann. art. 11.071(5)................................................ 10, 11, 19, 37

Tex. Crim. Proc. Code Ann. art. 11.071(5)(a)(1). ....................................... 20, 37

Tex. Crim. Proc. Code Ann. art. 11.073(a)(1),(2). ...................................... 21

Tex. Crim. Proc. Code Ann. art. 11.073(b)(1)(A)–(B)................................. 22

Tex. Crim. Proc. Code Ann. art. 11.073(b)(2). ............................................ 22

Tex. Crim. Proc. Code Ann. art. 11.073(d)–(d)(2) ...................................... 22

Tex. Penal Code Ann. § 19.03(a)(8) ........................................................... 8

**Other Authorities**

*A Biomechanical Analysis of the Causes of Traumatic Brain Injury in Infants and Children*, 25 Am. J. Forens. Med. & Pathol. 89–100 (June 2004)..................... 30

**Rules**

Rule 702 of the Texas Rules of Evidence ................................................... 32

**Constitutional Provisions**

Tex. Const. art. I §§ 1, 19......................................................................... 38

U.S. Const. amend. XIV............................................................................ 38

# INTRODUCTION

In 1999, two doctors told a jury that Applicant Richard Vasquez, Jr., intentionally beat his girlfriend's daughter to death. In light of modern scientific knowledge, it is now clear that the child had actually died after falling from a stool, and that the science underlying the State experts' conclusions was fundamentally flawed. Today we know that much of the State's evidence against Mr. Vasquez was based on little more than a series of scientifically flawed assumptions and conclusions. But when this case was tried on June 14–17, 1999, the scientific knowledge necessary to refute the State's expert testimony faulting Mr. Vasquez simply did not exist. Thus the testimony, though false, could not be effectively confronted. As a result, Mr. Vasquez was convicted of capital murder and condemned to die on the basis of false and misleading testimony.

The Texas legislature has recognized the inherent injustice of allowing convictions like Mr. Vasquez's to stand. On September 1, 2013, Article 11.073 of the Texas Code of Criminal Procedure took effect. Commonly referred to as the "Junk Science Law," Article 11.073 provides for habeas relief when an applicant can show that advances in scientific knowledge undermine scientific evidence relied upon by the State at trial. Fundamentally, Article 11.073 recognizes that people accused of a crime should have a fair chance to challenge the evidence against them, and when advances in scientific knowledge cast a conviction into

6

doubt, the accused person should have a fair chance to offer that new evidence in his defense. This Court recognized a similar principle in *Ex parte Chabot,* 300 S.W.3d 768, 711 (Tex. Crim. App. 2009), when it held that the State violates an accused person's right to due process when it offers false or misleading testimony to support a conviction, even if it does so unknowingly.

In Mr. Vasquez's case, advances in scientific knowledge show that key elements of the State's case against him were flat wrong. In light of intervening advancements in scientific knowledge regarding (1) Shaken Infant Syndrome, (2) deaths caused by short falls, (3) biomechanics, (4) and Second Impact Syndrome, Mr. Vasquez now has access to evidence that seriously undermines and forcefully rebuts the State's case against him. But at the time of his trial, Mr. Vasquez hardly stood a chance because the scientific knowledge necessary to refute the State's evidence simply did not exist.

As set out below and in the attached declarations of Drs. Thomas Young[1] and Waney Squier,[2] Mr. Vasquez now has access to scientific evidence that establishes his innocence of capital murder. Texas Law and fundamental fairness demand that he now be given a chance to challenge the junk science on which his conviction rests. In accordance with Article 11.073 and the decision in *Chabot,* Mr. Vasquez's application for writ of habeas corpus should be granted, his

---

[1] Young Decl. attached as Exhibit A.
[2] Squier Decl. attached as Exhibit B.

7

conviction and death sentence should be vacated, and he should be granted a new trial.

## PROCEDURAL HISTORY

On June 22, 1999, Mr. Vasquez was convicted and sentenced to death for murder of a child under the age of six. Tex. Penal Code Ann. § 19.03(a)(8). Mr. Vasquez filed an appeal raising only issues regarding his death sentence. On October 3, 2001, this Court issued its opinion affirming the conviction and sentence. *Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001) (not designated for publication).

On June 27, 2001, while the direct appeal was still pending, Mr. Vasquez filed his post-conviction application for writ of habeas corpus in state court pursuant to Article 11.071 of the Texas Code of Criminal Procedure seeking relief from his conviction and death sentence. The application raised numerous penalty phase claims and two juror claims. It did not raise any claims challenging the evidence at issue here. In 2003, Mr. Vasquez filed an amendment and supplement to his initial application, which also raised no claims based on the evidence challenged here. On May 19, 2004, the trial judge, adopted the findings and conclusions proposed by the State and recommended that Mr. Vasquez's application for writ of habeas corpus be denied. On January 26, 2005, the Court of Criminal Appeals, in an unpublished decision, adopted the trial judge's findings

and conclusions and denied Petitioner's initial application for writ of habeas corpus. The Court also dismissed the amendment and supplement, treating it as a subsequent application.

On January 26, 2006, Mr. Vasquez filed a federal habeas petition in the Southern District of Texas. Based on its review of the record, the district court rejected as unreasonable the state trial court's finding that trial counsel were not deficient in their penalty phase investigation of Mr. Vasquez's background. Nevertheless, the court denied the ineffective assistance claim, relying in part on the trial testimony of a State witness (Dr. Burke), *Vasquez v. Quarterman*, No. CC-05-059, 2008 WL 859147 at *12, which we now know to be false.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed, again citing the same flawed testimony as support for the district court's decision. *Vasquez v. Thaler*, 389 F. App'x 419, 427 (5th Cir. 2010). The United States Supreme Court denied Mr. Vasquez's petition for writ of certiorari. *Vasquez v. Thaler,* 131 S. Ct. 2445, (2011).

## CLAIMS FOR RELIEF

**I.     Mr. Vasquez raises three claims for relief, all of which satisfy the requirements of Article 11.071, Section 5.**

Claim 1.   Mr. Vasquez is entitled to habeas relief from his capital murder conviction and death sentence under Article 11.073  because there is scientific evidence that he did not cause the death of Miranda Lopez that was not available at trial and the new  scientific evidence contradicts scientific evidence relied on by the state at trial.

Claim 2.   Mr. Vasquez is entitled to habeas relief because both his conviction and his death sentence are based on material evidence that is now known to be false, in violation of his due process rights and *Ex parte Chabot*, 300 S.W. 3d 768, 771 (Tex. Crim. App. 2009);

Claim 3.   Mr. Vasquez is entitled to habeas relief because he is actually innocent of capital murder.

Under Section 5 of Article 11.071, "a court may not consider the merits of or grant relief based on the subsequent application" unless the application shows:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; . . .

*Id.* The claims presented in this application are based upon new scientific evidence which was not available at the time of trial.  Mr. Vasquez's claims arise under Article 11.073 which was enacted in 2013 and *Ex parte Chabot*, 300 S.W. 3d 768,

10

771 (Tex. Crim. App. 2009), neither of which were available to Mr. Vasquez when he filed his initial application on June 27, 2001, or when he filed an amendment and supplement on March 27, 2003. Clearly, "the legal basis for the claim[s] (Article 11.073 and *Chabot*) [were] unavailable on the date[s] of the previous application[s]." Article 11.071, Section 5. *See Ex Parte Robbins*, No. WR-73,484-02, 2014 WL 6751684, at \*8 (Tex. Crim. App. Nov. 26, 2014) (holding that Article 11.073 created a new legal basis for habeas relief); *Ex Parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012) (recognizing that *Chabot* created a new legal basis for habeas relief because it was "the first case in which [this Court] explicitly recognized an unknowing-use due-process claim")..

## STATEMENT OF FACTS

### I.  Relevant Evidence Admitted at Trial

#### A.  Miranda died from injuries sustained while she was under Mr. Vasquez' care.

At the age of eighteen years old, Mr. Vasquez was living with his aunt and uncle in their home. Also living with Mr. Vasquez were his girlfriend, their infant daughter, and his girlfriend's daughter, Miranda Lopez. Miranda was four, and Mr. Vasquez regularly watched Miranda and the baby while his girlfriend was at work.

11

On March 5, 1998, Mr. Vasquez dropped his girlfriend off at work before he returned home to take care of the children. (RR Volume 37:89–91.[3]) In a statement to the police, Mr. Vasquez admitted that he lost his temper with Miranda not long after returning home that morning, striking her on the head three times with the palm of his hand. (RR Volume 41: State's Ex. 8, at 2.) Mr. Vasquez then told her to go play outside, which she did. (*Id.*) About half an hour later, Mr. Vasquez called to Miranda from the upstairs portion of the home and told her to come in and brush her teeth. (*Id.*) Miranda came upstairs and carried a wooden stool, which she often used to reach the sink, into the hallway bathroom. (*Id.*) Mr. Vasquez was in his bedroom at the time, and from there he heard the stool fall over. (*Id.*) Miranda did not respond when Mr. Vasquez called her name, so he went to check on her. (*Id.*) He found her on the floor lying on her back, eyes open but otherwise unresponsive. (*Id.*)

Mr. Vasquez called 911 immediately. (*Id.*) Shortly thereafter, a police officer was first on the scene, and he found Mr. Vasquez trying to revive Miranda. (RR Volume 34:18–19.) The EMTs arrived next, and Miranda was taken to Driscoll Children's Hospital. (RR Volume 34:24.) At Driscoll, Dr. Michael J. Burke tried to save Miranda's life with emergency brain surgery. (RR Volume

---

[3] Throughout this Application references to the Reporter's Record from the trial court will be cited in the following format: (RR Volume #: Page #). References to the exhibits from the trial court will be cited as (RR Volume #: State's/Defendant's Ex. #).

36:80.) But Miranda died the next day. (RR Volume 41: Def.'s Ex. 45, at 16.) Although Mr. Vasquez explained throughout that he had not thought he'd hurt Miranda and that she had fallen from the stool immediately before losing consciousness, he was subsequently indicted for her capital murder.

**B. The State presented uncontradicted medical testimony that Miranda's death was the result of blunt force injuries that could only have been caused by child abuse.**

The State called two doctors to testify concerning the cause of Miranda's death: Dr. Lloyd White, then medical examiner for Nueces County, and Dr. Michael Burke, the neurosurgeon who operated on Miranda at Driscoll. Dr. White was the first expert to render an opinion on the cause of Miranda's death.

According to Dr. White, Miranda died from "[b]lunt force injuries of the head and brain," and the manner of her death was "[h]omicide" reflecting his opnion that the injuries were inflicted by a person. (RR Volume 41: Def.'s Ex. 45, at 16.) When asked by the prosecutor about how hard Miranda was struck he replied that "she was obviously struck hard enough to produce fatal injury." (RR Volume 36:41.)

Dr. Burke, the neurosurgeon who operated on Miranda testified that Miranda's death resulted from "[s]evere brain injury from child abuse." (RR Volume 36:79.) His testimony about the force causing her injuries was much more

13

aggressive than Dr. White's. He compared Miranda's brain injuries to those suffered during high-speed car accidents:

> The equivalent—this CAT scan—this picture, the only time it's seen is in a high-speed motor vehicle accidents, 65 miles an hour, ejected from the car, severe head trauma.

(RR Volume 36:79.) Dr. Burke also testified that Miranda's injuries were consistent with "Shaking Infant Syndrome":

> A subdural hematoma was the classic sign of what we called Shaking Infant Syndrome. This goes along with bleeding in the eyes. And these are children that can show up with a CAT scan that looks exactly like this. . . . It's hallmark of child abuse. **There is nothing else that does it.**

(RR Volume 36:91–92 (emphasis added).) Although Mr. Vasquez's counsel cross-examined Dr. Burke more aggressively than Dr. White, especially on Dr. Burke's comparison of Miranda's injuries to those suffered in high-speed car crashes, no scientific evidence was available to rebut any of Dr. Burke's claims. Nor was there any attempt to dispute the assertion that Mr. Vasquez caused Miranda's death. In countering the defense's closing argument regarding Mr. Vasquez's mens rea, the State relied heavily on the testimony of Dr. Burke, emphasizing that Miranda suffered "full force strikes to her head consistent with the injuries that would be sustained in a rollover at 65 miles an hour." (RR Volume 38:48.)

14

**C.** **Without evidence to refute the medical testimony of the State's expert witnesses concerning the cause of death, the defense attempted to refute the implications of the State's evidence regarding Mr. Vasquez's mental state.**

Mr. Vasquez testified in his own defense, admitting that he struck Miranda the morning she died, as he had from the beginning. He also reiterated that he had not believed that he'd hurt her when he did this, and that she seemed to be okay until after her fall from the stool. Since Mr. Vasquez's counsel could not dispute that Miranda died as a result of being struck, the critical question for the jurors and the court was whether Mr. Vasquez struck Miranda with the intent to kill or with knowledge that his behavior would likely kill her. In closing arguments, defense counsel said to the jury:

> [T]his case is not about 'Who done it?' Okay. . . . [T]he gist of [Mr. Vasquez's] statement is—and the gist of his testimony is that he admits to you that he hit this child, and too often, and caused her death. . . . The issue is whether he wanted her to die.

(RR Volume 38:21–22.)

After six hours of deliberation on June 18, 1999, the jury returned a verdict finding Mr. Vasquez guilty of capital murder.

The appeals that followed illustrate the how powerful and damaging Dr. Burke's testimony was. When discussing Mr. Vasquez's future dangerousness in the direct appeal opinion, the Court of Criminal Appeals specifically cited Dr. Burke's testimony comparing Miranda's injuries to those seen in high-speed car

15

accidents in its discussion of Mr. Vasquez's future dangerousness. And, as noted in the procedural history, both the United States District Court and the Fifth Circuit Court of Appeals cited Dr. Burke's testimony as substantial evidence that supported the death sentence.

**D.** **Current scientific medical evidence, that was not available at the time of trial, contradicts crucial testimony of the state's medical experts and establishes that Miranda died as a result of the fall.**

At Mr. Vasquez's request, two well-qualified physicians, Drs. Thomas Young (Exhibit A) and Waney Squier (Exhibit B) have examined Miranda's medical records and testimony from Mr. Vasquez trial and have provided sworn declarations concerning the current state of medical science with respect to material issues in Mr. Vasquez case. Both doctors explain that the expert medical testimony at Mr. Vasquez's trial, which concluded that the only cause of Miranda's lethal injuries had to have been child abuse, is based upon an understanding regarding the causes of the kind of brain damage seen in Miranda which has been refuted by numerous studies conducted after the trial, and that is no longer accepted by the general medical community.

As is explained by Dr. Thomas Young, science has now clarified that short falls, such as the one taken by Miranda from the stool, can and in fact do cause the type of catastrophic head injury observed upon Miranda's arrival in the emergency room. Although many physicians and pathologists used to believe that falls could

16

not cause catastrophic head and brain damage to children—and certainly did at the time of Mr. Vasquez's trial—observational studies as well as biomechanical studies have appeared since then which have established that they in fact can. Thus, pathologists, pediatricians, and criminal courts have all had to consider this possibility with a different potential as an explanation of events that had been previously understood as having resulted from deliberate child abuse. Here, we now know that the trial testimony from the pathologist which rejected the fall as the source of Miranda's lethal injuries—and did so on the basis that it is so uncommon as to be implausible explanation—is false, misleading, and rooted in scientific views that are no longer widely held. In fact, we now know that Mr. Vasquez's version of what happened—that Miranda lost consciousness and began to exhibit signs of catastrophic trauma to her head only after she fell from the stool—is entirely consistent with the head injuries later observed at the hospital.

That falls can readily cause the sorts of lethal injuries that happened here is further amplified in the declaration of Dr. Waney Squier, who explains that Miranda's fall was the cause of her death pursuant to a phenomenon called "Second Impact Syndrome," which was not understood at the time of Mr. Vasquez's trial. Dr. Squier notes as important the fact that Miranda was walking around and functioning after having been struck by Mr. Vasquez. In fact, Dr. Squier notes that any injury she suffered at this point would "almost certainly have

17

not been fatal." Squier Decl at 4-5. It was *only* after she fell down off of the stool that she suffered the catastrophic impact as evidenced by the immediate symptoms consistent with the remarkable brain swelling that was later confirmed at the hospital.

There is simply no reliable evidence here that establishes that Miranda's death resulted from Shaken Infant Syndrome, or any other form of child abuse. Rather, all of the evidence, when considered in light of current science, confirms what Mr. Vasquez has explained what happened all along: that Miranda fell off of a stool and immediately lost consciousness as a result.

In addition to this clarification that the injuries are consistent with Miranda's fall, in light of the intervening scientific developments in what is understood about such falls, current science no longer supports the testimony that Miranda's injuries could be likened to what would've happened to her in a 65 mile-per-hour car accident. Although this testimony was very aggravating, and was utilized by the State to implore the jurors to conclude that Mr. Vasquez must have intentionally been pounding Miranda to death—we now know that it was completely false, misleading, and unscientific. In other words: flatly untrue. Mr. Vasquez's strikes cannot be rationally or responsibly compared to anything that would happen to a child who was ejected from a vehicle at 65 miles per hour. No such intent on his part is evident or should have been inferred. In fact, all of the evidence which is

18

presented in this Application, and which rests on developments in science since the time of Mr. Vasquez's trial, confirms that Mr. Vasquez never hit Miranda hard enough to cause her death, and that her later fall is what caused the tragic outcome.

## CLAIM ONE

I.  **Mr. Vasquez is entitled to habeas relief under Article 11.073 because new scientific evidence shows that he did not cause the death of Miranda Lopez and contradicts scientific evidence relied on by the state.**

Newly available scientific evidence set forth in the declarations of Drs. Young and Squier demolishes the State's evidence that Mr. Vasquez intentionally killed Miranda and makes painfully clear that Mr. Vasquez was convicted on bad scientific evidence. If Mr. Vasquez's case were tried today, none of the pillars of the case against him would stand. The new advances in medical science discussed in Drs. Young and Squier's declarations reveal the fundamental problems with the testimony of the State's medical experts regarding: (1) Shaken Infant Syndrome, (2) deaths caused by short falls, (3) biomechanics, (4) and Second Impact Syndrome. But at the time of his trial, this evidence was not ascertainable because it did not yet exist. Article 11.073 is intended to remedy this fundamental unfairness.

## A. Mr. Vasquez is entitled to a decision on the merits of his 11.073 claim.

In defining the circumstances under which an applicant may seek habeas relief in a subsequent application, Section 5 of Article 11.071 of the Texas Code of Criminal Procedure provides that courts may consider an application's merits when "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." Tex. Crim. Proc. Code Ann. art. 11.071(5)(a)(1). Mr. Vasquez's first claim meets that standard because Article 11.073 was did not exist at the time of his previous application.

Article 11.073 was enacted on September 1, 2013, more than twelve years after Mr. Vasquez filed his initial application in 2001. Thus, in seeking relief under Article 11.073, Mr. Vasquez's application relies on a new legal basis that was unavailable to him when he filed his previous applications. *See Ex Parte Robbins*, No. WR-73,484-02, 2014 WL 6751684, at *8 (Tex. Crim. App. Nov. 26, 2014) (holding that Article 11.073 created a new legal basis for habeas relief). The only remaining question, then, is whether Mr. Vasquez's application alleges facts that are "at least minimally sufficient to bring him within the ambit of that new legal basis for relief." *Ex Parte Oranday–Garcia*, 410 S.W.3d 865, 867 (Tex. Crim. App. 2013). In the context of a claim under Article 11.073, that means Mr.

20

Vasquez must allege only that "there is arguably relevant scientific evidence that contradicts scientific evidence relied on by the state at trial, and that the evidence was not available at the time of trial." *See Ex Parte Robbins*, 2014 WL 6751684, at *8. Allegations of new scientific evidence that contradicts the "State's evidence regarding cause of death" are sufficient to bring a claim under Article 11.073's ambit. *Id.*

Mr. Vasquez's application meets that standard. As discussed in more detail below, Mr. Vasquez has access to new scientific evidence regarding Shaken Infant Syndrome, short falls, biomechanics, and Second Impact Syndrome, all of which would have been relevant at his trial to contradict the State's evidence regarding the cause and manner of Miranda's death. And because that science was either nonexistent or poorly understood at the time of his trial, it was not ascertainable through the exercise of reasonable diligence—the science underlying this application did not develop until well after the date of Mr. Vasquez's trial. Because Mr. Vasquez has alleged facts that bring him within the relief available under Article 11.073, he is entitled to a decision on the merits of his claims. *See Ex Parte Robbins*, 2014 WL 6751684, at *8 (finding that a subsequent applicant was entitled to a decision on the merits of his 11.073 claim because he "alleged prima facie facts in his application sufficient to invoke the new law . . . .").

21

**B.      Standard for granting relief under Article 11.073**

Article 11.073 was enacted to provide a new avenue for habeas relief in cases involving relevant scientific evidence that was unavailable to either "be offered by a convicted person at the convicted person's trial" or to "contradict[ ] scientific evidence relied on by the state at trial." Tex. Crim. Proc. Code Ann. art. 11.073(a)(1), (2).  To seek relief under Article 11.073, an applicant must file an application containing specific facts indicating that:

(A)     relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

(B)     the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application
. . . .

Tex. Crim. Proc. Code Ann. art. 11.073(b)(1)(A)–(B).  In evaluating whether an applicant filing a subsequent habeas application has made this showing, courts consider whether "relevant scientific knowledge or method . . . has changed since . . . the applicable trial date or dates . . . .[4]"  Tex. Crim. Proc. Code Ann. art. 11.073(d)–(d)(2).  Once a court finds that an applicant has met his burden, it may

---

[4] The relevant dates for determining the availability of scientific evidence in this case are the trial dates of June 14–17, 1999, rather than the date Vasquez filed his previous application because even if the relevant evidence were available at the time of the previous application, it would not have provided a legal basis for relief before Article 11.073 was enacted. *See Ex Parte Robbins*, 2014 WL 6751684, at *10 (using the date of trial, rather than the date of the applicant's previous application, to determine whether scientific evidence was available under Article 11.073).

22

grant habeas relief after finding by a preponderance that "the [applicant] would not have been convicted" if the scientific evidence had been presented at trial. Tex. Crim. Proc. Code Ann. art. 11.073(b)(2).

Because Article 11.073 was enacted approximately a year and half ago, there is only one reported decision that deals squarely with its requirements: *Ex Parte Robbins*, 2014 WL 6751684. In *Robbins*, the applicant had been convicted in 1999 of murdering his girlfriend's young daughter. At his trial, the medical examiner's testimony was particularly damning: She testified that she was sure beyond a reasonable doubt that the cause of death was homicide by asphyxiation. *Id.* at *3. Emphasizing that evidence, the State argued that "it was Applicant, and only Applicant, who could have caused the asphyxia-related death of [the victim]." *Id.* at *4. The jury convicted, and the applicant lost his direct appeal.

Several years after the applicant's conviction, the medical examiner changed her mind and decided that the victim's cause of death should have been undetermined rather than homicide. *Id.* at *5. Relying on that revised opinion, the applicant filed his first application for habeas relief in 2007. *Id.* The Court denied relief. *Id.* at 5–8. The applicant tried again in 2013 after Article 11.073 took effect, and based on that new law, the Court granted his application for habeas relief. *Id.* at 1.

In reaching its decision, the Court found that the medical examiner's change of heart qualified as new scientific knowledge, thereby holding that the term "scientific knowledge," as it is used in Article 11.073, applies to knowledge of individual experts as well as the general state of scientific knowledge. *Id.* at 9, 10. In so holding, the Court rejected the State's attempt to argue that the scientific knowledge the applicant relied upon was actually presented at trial because one of the applicant's experts testified that the victim's cause of death should have been deemed undetermined. *Id.*

## C.     New scientific evidence is available.

In a concurring opinion in *Robbins*, Judge Johnson recognized the range of scientific evidence that can be challenged under Article 11.073: "some examples of 'contradicted scientific evidence relied on by the state at trial' include arson, infant trauma, bullet-lead analysis, bite marks, some ballistics tests, blood-spatter patterns, and scent line-ups. Some such evidence has involved misinterpretation based on out-dated knowledge, some are simply junk science that has never been subjected to any kind of scientific investigation." *Ex Parte Robbins*, 2014 WL 6751684, at *13 (Johnson, J., concurring). As Judge Johnson noted, the crucial question is not whether scientific knowledge relied upon has been completely debunked, or merely refined: "Whether 'debunked' or 'refined' for increased

24

accuracy, changes in scientific knowledge in general, and therefore changes in scientific testimony by individuals, must be acknowledged and addressed." *Id.*

Since the time of Mr. Vasquez's trial, scientific knowledge has progressed in four crucial respects. First, the science underlying Shaken Infant Syndrome, which Dr. Burke relied upon at trial to explain the manner of Miranda's death, has been thoroughly debunked. Second, recent developments in scientific knowledge provide objective evidence that an accidental fall from a stool, rather than being struck by Mr. Vasquez, could have caused Miranda's fatal injury. Third, developments in the fields of biomechanics provide an avenue for rebutting key pieces of the State's evidence. And finally, key developments in the study of Second Impact Syndrome serve to corroborate Mr. Vasquez's trial testimony and contradict the State's evidence on the force of his strikes.

### 1. The Debunking of Shaken Infant Syndrome

Dr. Burke's testimony has served as key evidence against Mr. Vasquez at every stage of his case. His comparison of Miranda's injuries to those suffered in high-speed car accidents was emphasized by the prosecution in closing arguments and has been relied on by almost every court that has written an opinion on this case. In order to explain why he thought Mr. Vasquez's strikes inflicted the fatal wounds, Dr. Burke also testified that Miranda's injuries displayed "the classic sign of what we called Shaking Infant Syndrome. This goes along with bleeding in the

eyes. And these are children that can show up with a CAT scan that looks exactly like this. . . . It's hallmark of child abuse. There is nothing else that does it." (RR Volume 41:91–92.) There was no contrary scientific evidence to contradict that testimony, and Mr. Vasquez could only, in theory, cross-examine the facts in support. But as Dr. Thomas Young, a medical doctor who served for over a decade as the Medical Examiner of Jackson County, Missouri, notes in his attached declaration: "Today, without question, we know this is false, particularly the statement: 'There is nothing else that does it.'" Young Decl, at 4.

Since the time of Mr. Vasquez's trial, advances in scientific knowledge have thoroughly refuted Dr. Burke's testimony about Miranda's death. Dr. Burke described Miranda's injuries as "classic Shaking Infant Syndrome." But as Dr. Waney Squier, Consultant Neuropathologist to the Oxford Radcliffe Hospitals and Honorary Clinical lecturer in the University of Oxford, notes in her attached declaration, modern scientific knowledge now recognizes that the hypothesis underlying Shaken Infant Syndrome is "false . . . . and has not been supported by scientific evidence." Squier Decl, at 3. Likewise, Dr. Burke's testimony that injuries like those suffered by Miranda could only be caused by child abuse is no longer good science. As Dr. Young explains in his declaration, studies published since the time of Mr. Vasquez's trial provide verifiable scientific evidence that

shows that injuries like Miranda's are caused by a number of mechanisms, including accidental falls.  Young Decl, at 3–4.

### 2. *New Science on Head Injuries Caused by Falls*

Another key area that scientific knowledge has developed since the time of Mr. Vasquez's trial and which is critical to evaluating the evidence of culpability is a greater understanding of the injuries caused by short falls.  The lone testimony offered which was probative on the question of whether Miranda's death could have resulted from her fall stated that it was "unlikely," since deaths from falls such as the one that occurred here are "very, very rare."  (RR Volume 36:42.)

This critical testimony was based on scientific beliefs that are no longer generally held.  As Dr. Young notes, a 2001 article by John Plunkett M.D. changed the way claims of death caused by short falls are perceived by the scientific community.  Before Dr. Plunkett's article was published, "most physicians did not believe that short falls could cause death in children."  Young Decl, at 3.  That is precisely the approach that Dr. White took when he diagnosed the manner of Miranda's death: He casually dismissed the possibility that Miranda's fatal injury was caused by falling from a stool (RR Volume 36:42), which left being struck by Mr. Vasquez as the only other explanation.  The following exchange is illustrative:

Q.    Is there any way of knowing how hard [Miranda] was struck?

A.    Not precisely, no, except that obviously she was struck hard enough to produce fatal injury.

27

(RR Volume 36:40–41). Despite the obvious circularity of that reasoning (Dr. White concluded that "[Mr. Vasquez's] strikes obviously killed [Miranda] because she obviously died from [Mr. Vasquez's] strikes," Young Dec. 3), Mr. Vasquez's trial counsel was unable to challenge it with objective scientific evidence because such evidence simply did not exist at the time.

But it does now. In response to Dr. Plunkett's study, the scientific community has increasingly accepted the fact that relatively short falls can and do cause fatal injuries. Other studies followed, and as Dr. Young notes in his declaration,

> It is now generally accepted that some shorter distance falls may cause significant injury and death. Serious head injuries, skull fractures and other serious injuries have been reported in falls from stairs, bouncy chairs and car seats, shopping carts, from high chairs and even from toys dropped on children. Many of these reports are from the pediatric and public health literature and many public health agencies (such as the US Consumer Product Safety Commission and individual state and city health departments) and hospitals carry cautionary warnings to parents on their web-sites.

Young Decl, at 2. Dr. White's opinions are no longer based on good science, and it is not true that one can reject a finding that Miranda's fall was the event that killed her on the belief that this kind of thing rarely even happens in nature; we now know that it can and does happen. If Mr. Vasquez's case were tried today, he could not be convicted of capital murder given the objective scientific evidence

28

confirming the potential lethality of Miranda's fall. But at the time of his trial, that evidence simply was not available.

### 3. *Recent Advances in Biomechanics*

Biomechanics applies the principles of mechanics (Newton's law of motion) to living tissues. When Dr. Burke opined that the force of Mr. Vasquez's strikes was equivalent to those generated by high-speed car crashes, he was offering an opinion in what is now understood to be a fully separate area of science, biomechanics—an opinion that figured prominently into the State's case at every level of proceedings. Because forensics science did not at that time make use of the actual rigorous science of biomechanics, Mr. Vasquez was left with nothing scientific to refute these opinions:

> Q. You're not really suggesting that some human being could have the strength of a 65-mile-an-hour car?
>
> A. That is precisely what I'm suggesting, and that is precisely what I'm stating; and that has been well-documented.
>
> Q. A 65 mile an hour—
>
> A. That's correct.
>
> Q. —3,000 pound car?
>
> A. That's correct.

(RR Volume 36:91). As that exchange shows, the lack of available scientific evidence seriously impeded Mr. Vasquez's ability to refute Dr. Burke's testimony.

29

Today, however, advances in the fields of biomechanics have provided an objective, scientific avenue for challenging Dr. Burke's claims. Indeed, this Court has recognized that "new developments in the science of biomechanics" have shifted scientific understanding of the injuries that can be caused by accidental short falls. *Ex parte Henderson*, 384 S.W.3d 833, 833 (Tex. Crim. App. 2012). But at the time of Mr. Vasquez's trial, that knowledge had not developed to the point that it could have been offered in his defense. *See id.* (deciding the merits of a subsequent application because scientific knowledge in the field of biomechanics had not sufficiently developed at the time of the applicant's initial application in 2002).

Today, scientific studies published in the peer-reviewed literature highlight the seminal role of injury biomechanics and biomechanical reconstruction in pediatric injury evaluation. [5] If that knowledge had existed at the time of Mr. Vasquez's trial, a proper biomechanical study could have served both to refute Dr. Burke's testimony about the force generated by the strikes to Miranda and to shed objective, scientific light on the forces that would have been generated when Miranda fell from the stool. Thus, based on modern scientific knowledge that was unavailable at the time of Mr. Vasquez's trial, it is now clear that biomechanical

---

[5] *See, e.g.*, Werner Goldsmith & John Plunkett, *A Biomechanical Analysis of the Causes of Traumatic Brain Injury in Infants and Children*, 25 Am. J. Forens. Med. & Pathol. 89–100 (June 2004).

evidence can demonstrate the impact injury to a child's head from this sort of fall. *See Henderson*, 384 S.W.3d at 840 (Cochran, J., concurring) (quoting expert testimony recognizing that it is "not acceptable" today for an expert to "offer an opinion on the cause of an infant's death in a case [involving injuries potentially caused by a short fall] without any review or application of biomechanics")

### 4. Second Impact Syndrome

Finally, new scientific knowledge has developed in the study of Second Impact Syndrome. Dr. Squier describes Second Impact Syndrome as follows:

> In cases of Second Impact Syndrome, an initial head injury leaves a person with relatively mild-trauma indicated by a subdural hematoma. Ordinarily this injury is not lethal, and without further injuries the individual is likely to recover fully. Fatalities from this sort of injury are exceedingly rare. When such injuries are followed by a second impact before the first has had time to fully heal, the individual can suffer far more devastating injuries than were caused by the first injury. In cases involving Second Impact Syndrome, the second impact need not be severe; relatively minor impacts can cause catastrophic injuries.

Squier Decl, at 4. Thus, Second Impact Syndrome provides an objective, scientific explanation for cases in which two injuries—neither of which would be fatal on their own—combine to cause the sort of injuries suffered by Miranda.

At the time of Mr. Vasquez's trial, Second Impact Syndrome had not received serious scientific attention and thus was largely unknown and poorly understood. It was not until 2006, when a case study was published attempting to

31

"clarify the pathophysiology of Second Impact Syndrome," that the concept began to gain traction in the scientific community. Squier Decl, at 4.

As Dr. Squier notes in her declaration, the modern understanding of Second Impact Syndrome would have been highly relevant at Mr. Vasquez's trial because Mr. Vasquez's testimony describes precisely the sequence of events that one would expect in a case of Second Impact Syndrome. After the first impact (being struck by Mr. Vasquez), Miranda was stunned but able to remain standing and functioning; it was not until the second impact (falling from the stool) that Miranda lapsed into a coma. The pattern of Miranda's injuries—specifically, "the remarkably disproportionate swelling in her brain," Squier Decl, at 5—also supports a finding that Miranda's death was a result of Second Impact Syndrome, not Mr. Vasquez's strikes. None of this information was available to be offered at trial, however, because the relevant scientific knowledge had not yet developed.

**D.    The new scientific evidence would be admissible at a trial held today.**

Between the two of them, Drs. Young and Squier have testified as experts in hundreds of court cases, both criminal and civil. As their declarations and credentials show, the opinions that they have expressed regarding this case are both within their areas of expertise and based on well-established scientific principles and peer-reviewed literature. Thus, Drs. Young and Squier are qualified as experts in the areas of their testimony within the meaning of Rule 702 of the Texas Rules

32

of Evidence, so their testimony would be admissible as evidence if Mr. Vasquez's trial were held today.

### E. The new scientific evidence would have led to a different outcome at Mr. Vasquez's trial.

On the charge of capital murder, the jury was instructed as follows:

A person commits the offense of Capital Murder if the person intentionally or knowingly causes the death of an individual under the age of six years of age.

(RR Volume 38:1–2). Thus, in order to secure his conviction, the state had to prove beyond a reasonable doubt not only that Mr. Vasquez struck Miranda (a fact that was never disputed), but also that he either struck her so hard that he knew she would die or that he struck her intending to cause death.

To meet its burden of proof, the State relied largely on the unrebutted expert testimony of Drs. White and Burke. Mr. Vasquez's trial counsel attempted to undercut some of that testimony in cross-examination, but those efforts were frustrated by his inability to offer objective scientific evidence contradicting the State's evidence on the manner of Miranda's death and the force that was required to cause the brain damage she suffered. As discussed above, the necessary scientific knowledge simply did not exist at the time. Thus, at the close of evidence, the jury was presented with a record in which all of the scientific evidence pointed in one direction: Mr. Vasquez hit Miranda so hard that he knew she would die, so he must have intended to kill her. If the jury had access to the

33

scientific evidence attached to this application, it would have been a very different case.

First of all, Mr. Vasquez's statement about the circumstances of Miranda's injury would be corroborated by objective scientific evidence. At trial, the possibility that Miranda suffered her fatal injuries after falling from a stool was dismissed out of hand by the experts, thus casting into doubt everything else that Mr. Vasquez said. But scientific knowledge available today corroborates Mr. Vasquez's statements. As Dr. Young notes, modern scientific knowledge recognizes that a fall like the one Mr. Vasquez described could have caused Miranda's injuries, and Dr. Squier's discussion of Second Impact Syndrome provides a documented medical explanation for the injuries Miranda suffered. The science on Second Impact Syndrome corroborates Mr. Vasquez's testimony in other key respects as well: His description of Miranda as being somewhat dazed but otherwise able to continue to play and function normally after he struck her is entirely consistent with documented cases of Second Impact Syndrome. If the jury were presented with this scientific evidence, Mr. Vasquez's testimony would have carried far greater credibility. But because that evidence was lacking at trial, the jury could only assume that Mr. Vasquez was lying given the apparently credible scientific opinions of Drs. White and Burke.

Likewise, if today's scientific knowledge was available at the time of Mr. Vasquez's trial, he could have forcefully rebutted key elements of the scientific testimony against him. As Dr. Young notes in his declaration, scientific knowledge now recognizes that Dr. Burke's statement that wounds like Miranda's are only caused by child abuse is simply false. Young Decl, at 4. Likewise, Dr. Squier's declaration shows that Dr. Burke's testimony about Shaken Infant Syndrome has been exposed as a false hypothesis that "has not been supported by scientific evidence." Squier Decl, at 3. And as to Dr. Burke's high-speed-car-crash claim, which has been a key piece of the case against Mr. Vasquez at every level, that claim could have been refuted with a proper biomechanical study. Thus, if the scientific knowledge available today was available at the time of Mr. Vasquez's trial, Mr. Vasquez could have offered evidence that either contradicted or affirmatively disproved key elements of the State's case against him.

Most importantly, recent developments in scientific knowledge also cast into doubt a crucial fact that was undisputed at trial: that Mr. Vasquez's strikes were the cause of Miranda's death. In closing arguments, Mr. Vasquez's counsel conceded that Mr. Vasquez killed Miranda. But the declarations of Drs. Young and Squier show that such a powerful concession was unwarranted. In accordance with the new scientific knowledge discussed above, Mr. Vasquez could have forcefully challenged the State's case against him with evidence that Miranda's

35

death was caused by her fall from the stool. Indeed, as Dr. Squier states in her declaration, if Mr. Vasquez's strikes were the only injury Miranda suffered, she likely would have fully recovered were it not for the fall. Squier Dec. 4. At trial, Mr. Vasquez's defense counsel realized the danger of presenting such a defense without proof to back it up, so they took the only path that was available and conceded that Mr. Vasquez's strikes caused Miranda's death. But modern scientific knowledge provides compelling evidence that Mr. Vasquez *did not* kill Miranda, and a jury presented with the evidence discussed above would be unlikely to convict him of capital murder. In light of modern scientific knowledge, Dr. Young and Dr. Squier both dispute the conclusion that Mr. Vasquez's strikes caused Miranda's death. Had Mr. Vasquez been able to present that evidence at trial, the State could not have met its burden to prove that Mr. Vasquez killed Miranda.

But even if the jury ultimately concluded that Mr. Vasquez had caused Miranda's death despite the scientific evidence to the contrary, the new scientific evidence seriously contradicts the State's evidence that Mr. Vasquez struck her with the intent to kill or knowledge that she would die. The jury was instructed on the lesser included offenses of murder[6] and manslaughter,[7] and given the scientific

---

[6] The jury was instructed that "[a] person commits the offense of Murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." (RR Volume 38:4.)

36

evidence available today, the State's evidence that Mr. Vasquez struck Miranda with sufficient force to prove knowledge and intent is seriously questionable. In light of modern scientific knowledge, it is now clear that under the circumstances of Miranda's death, it is highly unlikely that Mr. Vasquez struck Miranda so hard that he knew she would die. Instead, the scientific evidence shows that it was an accidental fall from the stool that killed Miranda. Had that evidence been available at trial, the jury would not have convicted Mr. Vasquez of capital murder.

## CLAIM TWO

I.   **Mr. Vasquez is entitled to habeas relief because both his conviction and death sentence are based on evidence that is now known to be false, in violation of his due process rights and Ex parte Cabot.**

As discussed above, advances in scientific knowledge since the time of Mr. Vasquez's trial have revealed that key elements of the State's case against him are false. By introducing that false evidence, the State violated Mr. Vasquez's due process right to a fair trial. Whether the State knew the evidence was false or not is irrelevant; what matters is that the State's experts gave the jury a false impression about the manner of Miranda's death. As set out below, that false impression played a key role in Mr. Vasquez's conviction and punishment, thereby depriving him of his right to due process.

---

[7] The jury was instructed that "[a] person commits the offense of Manslaughter if he recklessly causes the death of an individual." (RR Volume 38:5.)

### A.    Mr. Vasquez is entitled to a decision on the merits of his claim under Chabot.

As set out above, Section 5 of Article 11.071 of the Texas Code of Criminal Procedure allows for merits determinations on subsequent applications when "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."   Tex. Crim. Proc. Code Ann. art. 11.071(5)(a)(1).   At the time of his previous applications, Mr. Vasquez's claim based on unknowing false testimony was unavailable because the legal basis of that claim did not exist until this court's decision in *Ex parte Chabot*, 300 S.W.3d 768; *see also Ex Parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012) (recognizing that *Chabot* was "the first case in which [this Court] explicitly recognized an unknowing-use due-process claim").

### B.    Standard for granting relief under Chabot.

As this Court recognized in *Ex parte Chabot*, 300 S.W.3d 768, the State violates an accused person's right to due process when it offers false testimony to support a conviction, even if it does so unknowingly. *See id.* at 771; *see also* U.S. Const. amend. XIV; Tex. Const. art. I §§ 1, 19.   In determining whether testimony is false, "a witness's intent in providing false or inaccurate testimony and the State's intent in introducing that testimony are not relevant." *Ex Parte Chavez*,

38

371 S.W.3d at 208; *see id.* ("Testimony need not be perjured to constitute a due-process violation; rather, it is sufficient that the testimony was false." (quotations omitted)). Thus, to establish a claim under *Chabot,* an applicant need only establish that "the testimony used by the State [was] false, and it [was] material to the defendant's conviction." *Robbins,* 360 S.W.3d at 459.

Whether testimony is false depends on "whether the testimony, taken as a whole, gives the jury a false impression." *Chavez,* 371 S.W.3d at 208. In addition to encompassing testimony that is literally untrue, testimony is also false under *Chabot* when a "witness omit[s] or gloss[es] over pertinent facts." *Ex Parte Robbins,* 360 S.W.3d 446, 462 (Tex. Crim. App. 2011); *see id.* ("We have explained that testimony that is untrue is one of many ways jurists define false testimony and the Supreme Court has indicated that improper suggestions, insinuations and, especially, assertions of personal knowledge constitute false testimony.").

To show that false testimony is material, an "applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment." *Chabot,* 300 S.W.3d at 771 (quoting *Ex parte Fierro,* 934 S.W.2d 370, 374-75 (Tex. Crim. App. 1996)). To meet that burden, an applicant is only required to show a "reasonable likelihood that the false testimony affected the applicant's conviction or sentence." *Chavez,* 371 S.W.3d at 207

39

(quotations omitted). This is a relaxed materiality standard, one "more likely to result in a finding of error than the standard that requires the applicant to show a reasonable probability that the error affected the outcome." *Chavez,* 371 S.W.3d at 207 (internal quotations omitted); *accord Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010) (appellant was entitled to relief by showing "a *fair probability* that appellant's death sentence was based upon . . . incorrect testimony") (emphasis added).

### C. The State presented false and misleading expert testimony at Mr. Vasquez's trial.

As discussed in Part II.B above, developments in scientific knowledge since the time of Mr. Vasquez's trial show that key elements of the State's expert testimony were false. When Dr. White casually dismissed the possibility that Miranda's injuries could have been caused by her fall, he "glossed over pertinent facts," *Robbins*, 360 S.W.3d at 462, about the frequency of fatal injuries in children caused by short falls. *See* Part III.B.2. above (discussing new scientific knowledge establishing that falls like Miranda's can and do cause fatal injuries). Likewise, as Dr. Young notes in his declaration, key elements of Dr. Burke's testimony are unquestionably false, including his claim that injuries like Miranda's are only caused by child abuse,[8] his misleading allusions to the discredited

---

[8] *See* Young Decl, at 4 ("Today, without question, we know this is false, particularly the statement: 'There is nothing else that does it.'").

40

hypothesis of Shaken Baby Syndrome,[9] and his repeated insistence on comparing Miranda's injuries to those caused by high-speed car crashes.[10]  Whether Drs. White and Young knew or could have known that they were misleading the jury is irrelevant to the question here: the fact remains that modern scientific knowledge has shown that their testimony was false and misleading.  *Ex Parte Chavez*, 371 S.W.3d at 208.  As a result, the State violated Mr. Vasquez's due process right to a fair trial when it offered false expert testimony against him at trial.  *Chabot*, 300 S.W.3d at 771.

### D. The State's reliance on false evidence to obtain Mr. Vasquez's conviction and death sentence cannot be upheld.

When the State offered the false testimony of Drs. White and Burke at trial, the scientific knowledge necessary to refute their testimony did not yet exist. Thus, Mr. Vasquez was convicted and sentenced to death based on facts and interences about his conduct which we now know are entirely untrue, and based on facts and inferences about Miranda's fall which we now know to be untrue.  In fact, there is no way for a factfinder to exclude the fall as the source of Miranda's death, and in fact we now know that Mr. Vasquez's strikes are not consistent with

---

[9] *See* Squier Decl, at 3 ("That testimony is false. It is based on hypothesis and has not been supported by scientific evidence.").

[10] *See* Squier Decl, at 3 (criticizing Dr. Burke's testimony about forces generated in car accidents as "false and unsupported by current scientific views in the forensic community"); *id.* 2–3, 3 (criticizing Dr. Burke's comparison of Miranda's injuries to those suffered in car crashes); Young Decl, at 4 (finding "no evidence in this case that supports a comparison to a 65-mph car accident").

41

Miranda's injuries. Mr. Vasquez was convicted by jurors who had only bad science, and did not have the current evidence, which would have permitted them to evaluate the weakness of the State's expert testimony: the only objective evidence presented to the jury about the manner of Miranda's death was the seemingly credible testimony of two doctors who both concluded that she must have died as a result of intentional child abuse. Likewise, the sentencing jury condemned Mr. Vasquez to die based on unrefuted testimony describing a beating so severe that a finding of future dangerousness was all but guaranteed. If Mr. Vasquez's case were tried today with the benefit of modern scientific knowledge and without the false testimony of Drs. White and Burke, it is hard to fathom that a jury would have reached the same conclusions about his guilt and his punishment. Due process demands that Mr. Vasquez have a fair chance to present his defense absent the State's false evidence against him, so the Court should grant his application for habeas relief. *See Chavez*, 371 S.W.3d at 207 (providing that relief should be granted when there is a "reasonable likelihood that the false testimony affected the applicant's conviction or sentence." (quotations omitted)).

42

## CLAIM THREE

**II.    Mr. Vasquez is entitled to habeas relief because he is innocent of capital murder.**

Mr. Vasquez is also entitled to relief of his capital murder conviction and death sentence because there is clear and convincing evidence that no reasonable juror would have convicted him of capital murder in light of all the evidence now available. *State ex rel. Holmes v. Court of Appeals,* 885 S.W.2d 389, 397 (Tex. Crim. App. 1994); *Ex parte Elizondo,* 947 S.W. 2d 389, 397 (Tex. Crim. App. 1994); *see also Herrerra v. Collins,* 506 U.S. 390 (1993). In reviewing this claim, the court assumes the trial was error free, but that new facts establish the applicant's innocence. *Ex parte Elizondo,* 947 S.W. 2d 389, 397 (Tex. Crim. App. 1994). In order to grant relief on the claim, the habeas court must be convinced that the new facts establish the petitioner's innocence

In light of the newly available scientific evidence showing that, contrary to what the State's experts testified, Miranda's lethal injuries could have resulted from the fall she indisputably took just prior to losing consciousness, and were consistent with her having taken a fall in light of the injuries to the back of her head and the immediate onset of traumatic response. New evidence makes clear that the notion that "child abuse is the only thing" that does what happened to Miranda is simply false. Moreover, new evidence establishes that any injuries

43

inflicted by Mr. Vasquez's earlier strikes were relatively minor, and cannot be rationally likened to her having been ejected from a vehicle at 65 miles per hour. In a trial held with the benefit of the new scientific evidence debunking these assertions, no juror would have been convinced beyond a reasonable doubt of Mr. Vasquez's guilt of capital murder.

The Court must necessarily reweigh all of the evidence to determine the likelihood that Mr. Vasquez will be acquitted of capital murder. *See Elizondo*, 947 S.W. 2d at 205-07 (distinguishing this burden). On the facts presented, because Mr. Vasquez 'can prove by clear and convincing evidence . . . that a jury would acquit him based on this newly discovered evidence, he is entitled to relief." *Id.* at 209.

## PRAYER FOR RELIEF

Accordingly, Applicant Richard Vasquez Jr. respectfully requests that the Court:

1) Remand the claims to the trial court with instructions to conduct an evidentiary hearing;

2) After an evidentiary hearing, enter findings that he has met his burden of proof on all of his claims;

3) Grant him a new trial;

4) Grant any other relief as law and justice require.

44

Respectfully submitted,

EDISON, MCDOWELL & HETHERINGTON LLP

By:   */s/ Andrew M. Edison*
      Andrew M. Edison
      Texas Bar No. 00790629

      James M. Chambers
      Texas Bar No. 24092240

Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
andrew.edison@emhllp.com
james.chambers@emhllp.com

ATTORNEYS FOR RICHARD VASQUEZ, JR.

**Verification**

STATE OF TEXAS         )

                            )    ss:

COUNTY OF HARRIS     )

**Affidavit of Andrew M. Edison**

BEFORE ME, the undersigned authority, on this day personally appeared Andrew M. Edison, who upon being duly sworn by me testified as follows:

1. I am a member of the State Bar of Texas.

2. I am the duly authorized attorney for Richard Vasquez, Jr., and have the authority to prepare and verify his Subsequent Application for Post-Conviction Writ of Habeas Corpus.

3. I have read the Application for Post-Conviction Writ of Habeas Corpus, and I believe all the allegations therein to be true and correct.

4. I am signing this verification on behalf of my client Richard Vasquez, Jr.

_____

Andrew M. Edison

Subscribed and sworn to before me this 15th day of April, 2015.

_____

Notary Public

ANGELA M. BROADY
Notary Public, State of Texas
My Commission Expires
April 10, 2017

My commission expires:   4-10-17

**CERTIFICATE OF COMPLIANCE**

I certify that the word count of this application is 9,453, exclusive of exhibits, the cover page, the tables of content, the tables of authorities, the verification page, and the certificates of compliance and service.

_/s/ Andrew M. Edison_
Andrew M. Edison

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this motion has been served on April 15, 2015, by email and first-class mail to the following:

Mark Skurka
James Rosenkild
Nueces County District Attorney's Office
901 Leopard Street, Room 206
Corpus Christi, TX 78401
mark.skurka@nuecesco.com
james.rosenkild@nuecesco.com

Matthew Ottoway
Office of the Attorney General
PO Box 12548
Austin, TX 78711
matthew.ottoway@texasattorneygeneral.gov

_/s/ Andrew M. Edison_
Andrew M. Edison

# EXHIBIT A

IN THE 148TH DISTRICT COURT
OF NUECES COUNTY, TEXAS

AND

IN THE COURT OF CRIMINAL APPEALS OF TEXAS
IN AUSTIN, TEXAS

| | |
|---|---|
| RICHARD VASQUEZ, JR. )<br><br>APPLICANT. ) | WRIT NO. _____<br><br>TRIAL COURT NO. 98-CR-0730-E<br><br>CAPITAL CASE<br><br>Scheduled Execution Date:<br>April 23, 2015 |

## DECLARATION OF DR. THOMAS YOUNG

My name is Dr. Thomas W. Young. My date of birth is June 12, 1956, and my address is 12717 Oakmont Drive, Kansas City, Missouri, 64145, USA. I declare under penalty of perjury that the following is true and correct:

I am a doctor of medicine. I have more than 25 years of experience as a full-time forensic pathologist. I have performed nearly 5,400 autopsies, testified in civil and criminal court more than 420 times, and provided deposition testimony more than 100 times. Since January of 2007, I have provided consultant services in forensic pathology, consulting in cases throughout the United States and in other areas of the world. Prior to my self-employment, I was the Medical Examiner of Jackson County, Missouri for 11 1/2 years, serving as the chief death investigator for metropolitan Kansas City on the Missouri side of the state line. I have attached a summary of my education and experience (CV) as Exhibit A.

I am over the age of 21 years, of sound mind, and I am fully competent to make this declaration.

### Items Reviewed

I have reviewed the following at your request concerning this case: trial transcripts from the capital murder trial of Richard Vasquez and various exhibits from the capital murder trial of Mr. Vasquez, including the autopsy report of the victim, four-year old Miranda Lopez, the police report, Mr. Vasquez's statement to police, medical records and photographs of Miranda

1

## Opinions

It is my opinion that the injuries Miranda suffered are entirely consistent with her fall from the stool as described by Mr. Vasquez. I disagree with the conclusion of Drs. White and Burke that the manner of death was homicide because that conclusion violates the Inferential Test and is based on invalid assumptions that have been discredited by intervening developments in scientific knowledge.

It is also my opinion that the pattern of injuries to Miranda's genitals are not consistent with sexual penetration. There are many ways that a child could develop the injuries seen by Miranda that are not related to sexual activity. She evidenced none of the characteristic stretching or tearing that is usually associated with penetration in cases of sexual assault of young children.

## The Inferential Test

On October 16, 2014, I presented a "little lesson in logic" called the Inferential Test at a meeting of forensic scientists from all over the world. The abstract for the presentation was peer-reviewed and accepted for presentation. The Inferential Test is as follows:

> One can be reasonably certain if witness accounts of the past are consistent or not consistent with physical evidence in the present, but one cannot reliably surmise past events from physical evidence unless there is only one plausible explanation for that evidence.[1]

By applying that test, courts and jurors can reliably evaluate any scientific expert testimony offered at trial. After reviewing the State's expert scientific evidence against Mr. Vasquez through the lens of the Inferential Test, I have identified the following areas in which the State's experts based their testimony on fallacious reasoning and invalid modes of logic that have been contradicted by reliable scientific evidence that has developed since the time of Mr. Vasquez's trial.

## The State's Experts Testimony

A. Injuries From Short Falls

Dr. Lloyd White determined that the manner of Miranda's death was homicide. In reaching that conclusion, Dr. White made two key errors. First, he employed circular reasoning to conclude that Mr. Vasquez's strikes were of sufficient force to cause Miranda's death:

Q. Is there any way of knowing how hard [Lopez] was struck?

---

[1] Young TW: A Little Lesson in Logic. Presented at the World Forensic Festival, International Academy of Forensic Sciences, Seoul, South Korea, October 16, 2014.

A. Not precisely, no, except that obviously she was struck hard enough to produce fatal injury.

Essentially, then, the chain of logic underlying Dr. White's conclusion is that Vasquez's strikes obviously killed Lopez because she obviously died from Vasquez's strikes.

But in addition to the circularity of his logic, intervening developments in scientific knowledge have revealed an even more fundamental error with Dr. White's conclusion: He failed the Inferential Test when he attempted to explain the circumstances of Miranda's death without properly considering whether her injuries were consistent with Mr. Vasquez's statement.

At the time, most physicians did not believe that short falls could cause death in children. But Dr. John Plunkett falsified that hypothesis in a 2001 article[2] based on a search of the U.S. Consumer Products Safety Commission ("CPSC") database for fatal head injuries associated with the use of playground equipment, which revealed 18 witnessed accidental events resulting in fatal brain injury. Other studies followed that further falsified the notion that short falls do not cause death in children, including a case study that documented a case in which a child suffered fatal head injuries in a short fall from a bed.[3] Many of these reports are from the pediatric and public health literature and many public health agencies (such as the CPSC and individual state and city health departments) and hospitals carry cautionary warnings to parents on their websites.

Thus, modern scientific knowledge based on reliable observational evidence affirms that it is indeed possible for a short fall such as the one described by Mr. Vasquez to cause Miranda's injuries. Therefore, Dr. White's conclusions are unreliable because he surmised past events from physical evidence without carefully considering Mr. Vasquez's version of events.

B.      Shaken Infant Syndrome

Dr. Michael Burke diagnosed Miranda with "[s]evere brain injury from child abuse." In concluding that Miranda's injuries were caused by child abuse, Dr. Burke relied heavily on the pattern of injuries revealed by Miranda's CAT scans, which included a subdural hematoma. Dr. Burke explained his understanding of the subdural hematoma's significance as follows:

A subdural hematoma was the classic sign of what we called the Shaking Infant Syndrome. This goes along with bleeding in the eyes. And these children can show up with a CAT scan that looks exactly like this. Absolutely no external injuries whatsoever. They have bleeding in the eyes. They have a brain that is devastated. They have a subdural hematoma. It's a hallmark of child abuse. There is nothing else that does it.

---

[2] Plunkett, J., Fatal Pediatric Head Injuries Caused by Short-Distance Falls, Am. J. of Forensic Medicine and Pathology Vol. 22; 1-12 (2001).

[3] Denton, JS, and Mileusnic, D., Delayed Sudden Death in an Infant Following an Accidental Fall: A Case Report with Review of the Literature, Am. J. of Forensic Medicine and Pathology, Vol. 24, No. 4, Dec. 2003.

3

In short, Dr. Burke testified at trial that there could be no other explanation for wounds like Miranda's but child abuse, so child abuse must have caused her wounds.

Today, without question, we know this is false, particularly the statement: "There is nothing else that does it." By making the unwarranted assumption that the only explanation for Miranda's wounds was child abuse, Dr. Burke's testimony is unreliable as demonstrated by the Inferential Test. As discussed above, developments in scientific knowledge beginning with the publication of Dr. Plunkett's article in 2001 have falsified that assumption by identifying verified cases of fatal head injuries like Miranda's that were not caused by abuse.[4]

Further, many experts can explain today that the triad of signs seen in "classic" shaken baby syndrome cases—subdural hematoma (bleeding on the brain), retinal hemorrhage (bleeding in the eyes), and cerebral edema (brain swelling)—can come from a variety of sources, including short falls. Thus, due to intervening changes in scientific knowledge, it is clear that the injuries that caused Miranda's death can be caused by many mechanisms unrelated to child abuse, so Dr. Burke's attempts to diagnose her death as the product of child abuse are invalid under the Inferential Test.

C.     Injuries Suffered in Car Accidents at High Speeds

In my experience as a medical examiner, I have examined hundreds of individuals who suffered fatal injuries resulting from car accidents at high speeds. Although Dr. Burke's testimony repeatedly compared the injuries Miranda suffered to those suffered in 65-mph car accidents, that testimony violates the Inferential Test because it improperly relies on speculation and conjecture rather than Mr. Vasquez's testimony. There is no evidence in this case that supports a comparison to a 65-mph car accident.

D.     Sexual assault.

At trial, the State offered expert testimony concluding that Miranda had been sexually abused based on the presence of injuries around her genitals. There was, however, no testimony that suggests there was any witnessed sexual abuse. Although the medical records indicate that Miranda had abrasions in her labia majora, labia minora, and perineum, a wide variety of circumstances could cause those injuries, most of which having nothing to do with sexual contact. Further, the injuries that were present are not consistent with sexual penetration: Miranda's hymen was intact, there was no gross stretching of the introitus (the opening into the vagina) or anus, which had "good sphincter tone"—in a child of Miranda's age, any sexual penetration would cause major dilatation and tearing of these tissues.

**Conclusion**

Based on my education, my experience, and my review of the records identified above, it is my professional opinion that relevant scientific evidence is currently available and was not

---

[4] Supra notes 2–3.

4

available at the time of Richard Vasquez's 1999 trial because it was not ascertainable through the exercise of reasonable diligence at that time.

All of my opinions expressed here are to a reasonable degree of medical certainty. I reserve the right to supplement my opinions in this matter in the event additional information or arguments are provided in this case.

Executed in *Kansas City*, *Jackson* County, *Missouri* on April *14*, 2015.

Dr. Thomas W. Young MD

# CURRICULUM VITAE

# THOMAS WILLIAM YOUNG, M.D.

PERSONAL DATA:

Birthdate:              June 12, 1956

Birthplace:             La Mesa, California

PROFESSIONAL POSITION:

                        Heartland Forensic Pathology, LLC (private practice)
                        12717 Oakmont Drive
                        Kansas City, Missouri 64145

ACADEMIC RECORD:

College:                Loma Linda University
                        College of Arts and Sciences
                        Riverside, California
                        October 1974 - June 1977

Medical School:         Loma Linda University
                        School of Medicine
                        Loma Linda, California
                        September 1977 - November 1980
                        Bachelor of Science (Human Biology) and
                        Medical degrees awarded on November 30, 1980

Internship and Residency:   Anatomic and Clinical Pathology
                        Loma Linda University Medical Center and Jerry L. Pettis
                        Memorial Veterans Administration Hospital
                        Loma Linda, California
                        January 1981 - December 1984

Fellowship:             Forensic Pathology
                        Office of the Medical Examiner, Fulton County (Program
                        affiliated with Emory University, School of Medicine)
                        Atlanta, Georgia
                        July 1988 - June 1989

BOARD CERTIFICATION:

Diplomate-National Board of Medical Examiners
January 2, 1982

Diplomate-American Board of Pathology
Anatomic and Clinical Pathology - May 31, 1985
Forensic Pathology - September 25, 1989

MEDICAL LICENSURE:

Missouri—MD108989
Kansas—04-32417
Georgia—030931 (inactive)

PROFESSIONAL ACTIVITIES:

Heartland Forensic Pathology, LLC (private practice)
Kansas City, Missouri
January 2007 – Present

Review Board, The American Investigative Society of Cold
Cases (AISOCC)
June 2013 – Present

Jackson County Medical Examiner
Kansas City, Missouri
July 1995 – December 2006

Medical Examiner, Platte County Missouri
July 1995 – December 2006

Medical Examiner, Clay County Missouri
April 1996 – December 2006

Medical Examiner, Cass County Missouri
January 2004 – December 2006

Director, Office of the Jackson County Medical Examiner
Forensic Pathology Training Program
July 2002 – December 2006

Clinical Associate Professor
University of Missouri-Kansas City School of Medicine
September 1997 – December 2006

Forensic Pathologist, National Disaster Medical System
(DMORT - 7)
United States Department of Homeland Security
October 1996 – March 2006

Participated in Federal Disaster Response involving
Korean Airlines Flight 801, Guam
August 1997

Associate Medical Examiner, Fulton County
Atlanta, Georgia
July 1989 - June 1995

Assistant Professor of Pathology,
Emory University School of Medicine
August 1994 - June 1995

Clinical Assistant Professor of Pathology,
Emory University School of Medicine
July 1991 - August 1994

Medical Examiner for Division of Forensic Sciences,
Georgia Bureau of Investigation
Decatur, Georgia
July 1989 - June 1995

Chief, Anatomic Pathology
Ehrling Bergquist Strategic Hospital
Offutt Air Force Base, Nebraska
January 1985 - May 1988

Medical Director, Phase II
Laboratory Technician Training Program
Ehrling Bergquist Strategic Hospital
Offutt Air Force Base, Nebraska
January 1985 - May 1988

Major, Active Duty
United States Air Force Medical Corps
January 1985 - May 1988

## PROFESSIONAL MEDICAL SOCIETIES:

Alpha Omega Alpha Honor Medical Society (1980)
American Society of Clinical Pathologists (1983; Fellow 1985)
College of American Pathologists (Fellow 1985)
American Academy of Forensic Sciences (1989; Fellow 2003)
National Association of Medical Examiners (1989; Fellow)

## PUBLICATIONS:

1. Young TW, Thrasher TV. Non-chromaffin Paraganglioma of the Uterus - A Case Report. Arch Pathol Lab Med 106:608-609, 1982.

2. Young TW, Keeney GL, Bull BS. Red Cell Fragmentation in Human Disease (A Light and Scanning Electron Microscope Study). Blood Cells 10:493-501, 1984.

3. Young TW. Reye's syndrome. A Diagnosis Occasionally First Made at Medicolegal Autopsy. Am J Forensic Med Pathol 13:21-27, 1992.

4. Mandsager NT, Young TW. Pain During Sexual Response Due to Bilateral Bartholin Gland Adenomas. A Case Report. J Reprod Med 37:983-985, 1992.

5. Young TW, Pollock DA. Misclassification of Deaths Caused by Cocaine. An Assessment by Survey. Am J Forensic Med Pathol 14:43-47, 1993.

6. Gulino SP, Young TW. Restraint asphyxia [letter]. Am J Forensic Med Pathol 21(4):420, 2000.

7. Garg U, Althahabi R, Amirahmudi V, Brod M, Blanchard C, Young T. Hyaluronidase as a Liquefying Agent for Chemical Analysis of Vitreous Fluid. J Forensic Sci 49 (2):388-391, 2004.

8. Young TW, Wooden SE, Dew PC, Hoff GL, Cai J. The Richard Cory Phenomenon: Suicide and Wealth in Kansas City, Missouri. J Forensic Sci 50(2):443-447, 2005.

9.   Rosales CM, Laboy MA, Young T, Garg U.  Death of an Infant Involving Guaifenesin.  Tox Talk 30(3):9, 2006.

10.  Young TW.  Examination of Female Pelvic Organs by *en bloc* Resection. In: Spitz WU, editor.  Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation. Springfield, IL: Charles C. Thomas, 2006.

11.  Young TW.  Catch-22 No More!  Twenty-two Lessons Learned as a Chief Medical Examiner.  http://www.heartlandforensic.com/writing/catch-22. August 12, 2007.

12.  Young TW, Okoye MI.  The Role of the Forensic Pathologist in a Mass Disaster.  In: Okoye MI, Wecht CH, editors.  Forensic Investigation and Management of Mass Disasters.  Tucson, AZ: Lawyers & Judges Publishing Company, Inc, 2007.

13.  Rosales CM, Young T, Laster MJ, Eger EI, Garg U.  Sevoflurane Concentrations in Blood, Brain and Lung After Sevoflurane-Induced Death.  J Forensic Sci 52 (6): 1408-1410, 2007.

14.  Young TW.  Forensic Science and the Scientific Method. http://www.heartlandforensic.com/writing/forensic-science-and-the-scientific-method.  February 13, 2008.

15.  Young TW.  An Inferential Test for Expert Testimony. http://www.heartlandforensic.com/writing/an-inferential-test-for-expert-testimony.  April 5, 2009.

16.  Young TW.  Is Sherlock Holmes' "Reasoning Backwards" a Reliable Method for Discovering Truth?  Analyses of Four Medicolegal Cases. http://www.heartlandforensic.com/writing/is-sherlock-holmes-reasoning-backwards-a-reliable-method-for-discovering-truth.  September 14, 2010.

17.  Young TW.  Attorneys and Judges, You Can Stop the Madness Now. http://www.heartlandforensic.com/writing/attorneys-and-judges-you-can-stop-the-madness-now.  September 19, 2010.

18.  Young TW.  Fatal Bronchial Asthma With Bilateral Lung Collapse.  Am J Forensic Med Pathol 31(4):373-375, 2010.

19.  Young TW.  Do Resuscitation-Related Injuries Kill Infants and Children? [letter]  Am J Forensic Med Pathol 31(4):e6, 2010.

20. Young TW. Putting It All Together: The Logic Behind the Forensic Scientific Method and the Inferential Test. http://www.heartlandforensic.com/writing/putting-it-all-together-the-logic-behind-the-forensic-scientific-method-and-the-inferential-test. January 11, 2011.

21. Young TW. Do You Know The Difference Between Diagnostic Medicine and Forensic Medicine? http://www.heartlandforensic.com/writing/forensic-inference/do-you-know-the-difference-between-diagnostic-medicine-and-forensic-medicine. April 23, 2011.

22. Young TW. The Death of SIDS [letter]. Acad For Path 1(1):238, 2011.

23. Young TW. Shaken Infants Die of Neck Trauma, Not of Brain Trauma [letter]. Acad For Path 1(1):240-241, 2011.

24. Young TW. The Inferential Test is Always True. Think of it as a Law. http://www.heartlandforensic.com/writing/forensic-inference/the-inferential-test-is-always-true-think-of-it-as-a-law. September 11, 2011.

25. Young TW. Dr. Young Addresses The Big Question. http://www.heartlandforensic.com/writing/chapter-0-introduction. November 10, 2011.

26. Young TW. Inference in Forensic Pathology [letter]. Acad For Path 2(1):105-106, 2012.

27. Young TW. Diatoms, Retinal Hemorrhages and Other Forensic Tests: A Logical Assessment Using Probability Theory. http://www.heartlandforensic.com/writing/diatoms-retinal-hemorrhages-and-other-forensic-tests. August 29, 2012.

28. Young TW. Forensic Inference Emails. Accessed through home page of www.heartlandforensic.com. December, 2012 to February, 2015.


## ABSTRACTS AND FORMAL PRESENTATIONS:

1. Hanzlick RL and Young TW: Cocaine-related Death Survey. Presented at the 23rd Annual Meeting of the National Association of Medical Examiners, Sanibel Island, Florida, September 1989.

2. Young TW: Reye's syndrome. A Diagnosis Occasionally First Made at Medicolegal Autopsy. Presented at the 24th Annual Meeting of the National Association of Medical Examiners, Denver, Colorado, September 1990.

3. Young TW and Pollock DA: Misclassification of Deaths Caused by Cocaine. An Assessment by Survey. Presented at the 43rd Annual Meeting of the American Academy of Forensic Sciences, Anaheim, California, February 1991.

4. Young TW: The Significance of Pigmented Pulmonary Macrophages in a Forensic Autopsy Population. Presented at the 45th Annual Meeting of the American Academy of Forensic Sciences, Boston, Massachusetts, February 1993.

5. Young TW: Basics of Death Investigation. Presented at the 105th Annual Meeting of the American Academy of Insurance Medicine, Kansas City, Missouri, October 1996.

6. Pattison CP, Marshall BJ, Young TW and Vergara GG: Is Helicobacter pylori the Missing Link for Sudden Infant Death Syndrome (SIDS)? Supplement to Gastroenterology 112:4, A254, 1997. Presented at the 97th Annual Meeting of the American Gastroenterological Association, May 1997.

7. Young TW, Blanchard CC, Brasfield R: Decapitation by Motorized Shoulder Harness, A Case Report. Presented at the 54th Annual Meeting of the American Academy of Forensic Sciences, Atlanta, Georgia, February 2002.

8. Garg U, Althahabi R, Brod M, Young T, Blanchard C: Hyaluronidase as a Liquefying Agent for Chemical Analysis of Vitreous Fluid. Presented at the Annual Meeting of the Society of Forensic Toxicologists, October 2002.

9. Gill TH, Young TW, Brasfield R: Sudden Death From Post-Traumatic Syringomyelia. Presented at the 37th Annual Meeting of the National Association of Medical Examiners, San Jose, California, September 2003.

10. Young TW, Gill TH, Brasfield R, Duffey J: Death by Bezoar? Presented at the 37th Annual Meeting of the National Association of Medical Examiners, San Jose, California, September 2003.

11.  Garg U, Frazee SC, Breckenbach B, Kiscoan M, Johnson L, Miller J, Young TW: Interpreting Postmortem Tricyclic Antidepressant Levels in Vitreous Humor.  Presented at the Annual Meeting of the Society of Forensic Toxicologists, October 2003.

12.  Young TW, Wooden S, Cai J, Hoff GL, Dew PC:  The Richard Cory Phenomenon, Suicide and Socioeconomic Status in Kansas City, Missouri. Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, Texas, February 2004.

13.  Gill TH, Young TW, Willard MJ, Garg U, and Dasuki M:  Fatty Oxidation Disorders and Sudden Unexpected Death in Children.  Presented at the 39th Annual Meeting of the National Association of Medical Examiners, Nashville, Tennessee, September 2004.

14.  Gill TH and Young TW: Slavemaster.com, The Serial Murders of John E. Robinson, Sr. Presented at the 38th Annual Meeting of the National Association of Medical Examiners, Nashville, Tennessee, September 2004.

15.  Young TW, Brasfield R, and Gill TH: Catch-22 No More!  Twenty-two Lessons Learned After 10 years as a Chief Medical Examiner.  Presented at the 39th Annual Meeting of the National Association of Medical Examiners, Los Angeles, California, October 2005.

16.  Young TW: Forensic Science and the Scientific Method.  Presented at the 19th Annual Alumni Reunion Meeting, Department of Pathology and Human Anatomy, Loma Linda University School of Medicine, Loma Linda, California, March 2009.

17.  Young TW: Pseudostrangulation.  Presented at the 62nd Annual Meeting of the American Academy of Forensic Sciences, Seattle, Washington, February 2010.

18.  Young TW: Is It Really So Elementary, My Dear Watson?  What Every Attorney Should Know About Flawed Forensic Science Reasoning. Presented at the North American Regional Meeting of the International Society of Family Law, Kansas City, Missouri, June 2010.

19.  Young TW: Is It Really So Elementary, My Dear Watson?  What Every Attorney Should Know About Flawed Forensic Science Reasoning. Presented at the 15th International Conference of the National Child Abuse Defense and Resource Center, Las Vegas, Nevada, August 2010.

20.    Young TW: What Every Pathologist Should Know About *Forensic Medicine.*  Presented at the Osler Institute Pathology Board Review Course, Schaumburg, Illinois, April 2011.

21.    Young TW: A "Show-Me" State Doctor Takes On Sherlock Holmes. Presented at the Connecticut Public Defender Spring Seminar, Hartford, Connecticut, May 2011.

22.    Young TW: The Most Significant Fallacy of Modern Science.  Presented at the Indiana Public Defender Seminar entitled, "Defending Child Abuse Allegations," Fort Wayne, Indiana, May 2012.

23.    Young TW: A Little Lesson in Logic.  Presented at the World Forensic Festival, International Academy of Forensic Sciences, Seoul, South Korea, October 16, 2014.

April 6, 2015

# EXHIBIT B

RICHARD VASQUEZ, JR.

        APPLICANT.

WRIT NO. _____

TRIAL COURT NO. 98-CR-0730-E

CAPITAL CASE

Scheduled Execution Date:
April 23, 2015

## DECLARATION OF DR. WANEY SQUIER

My name is Dr. Waney Squier, my date of birth is February 28th 1948 and my address is Department of Neuropathology, Level 1, West Wing, John Radcliffe Hospital, Headley Way, Oxford, OX3 9DU. I declare under penalty of perjury that the foregoing is true and correct.

1. I am over the age of 21 years, of sound mind, and I am fully competent to make this declaration. I have personal knowledge of the statements contained herein.

2. I am Dr. Waney Squier, Consultant Neuropathologist to the Oxford Radcliffe Hospitals and Honorary Clinical lecturer in the University of Oxford. In the last fifteen years, I have written reports and given evidence in court for both the prosecution and the defense in many cases of sudden unexpected death in infants and children. My experience and qualifications are set out in further detail in the attached CV.

3. In preparing this report I have attempted to be as accurate and as complete as possible and my opinions are restricted only to those subjects which are within my area of expertise. Wherever possible, my opinion is based on evidence derived from the peer reviewed literature in addition to my own professional experience. I believe, to a reasonable degree of medical certainty, that the facts I have stated in this report are true and that the opinions I have expressed are correct.

1

## 4. REVIEW OF EVIDENCE

In preparing this report, I have reviewed trial transcripts from the capital murder trial of Richard Vasquez and various exhibits from that trial, including the autopsy report of Miranda Lopez, a police report, Richard Vasquez's statement to police, voluminous medical records and photographs of Miranda Lopez.

## 5. OPINIONS

1. **The cause of death was blunt force injuries to the head.**

   Miranda's primary cause of death was blunt force injuries to the head consistent with a fall from a stool. The autopsy did not include microscopic examination of the brain so the best pathological information is from the lobectomy specimen taken on the day of admission. The frontal lobectomy specimen was 6.8x5.3x1.1 cm with edema and subarachnoid bleeding; additional petechial haemorrhage was seen at the grey-white junction; these areas were in a pericapillary distribution and described as seen in traumatic injury. No accompanying neutrophil or fibroblastic response was seen indicating that the injury was less than two days old.

2. **The strikes to Miranda's head by Mr. Vasquez, on their own, were probably insufficient to cause fatal injuries.**

   After Mr. Vasquez struck Miranda, she was dazed, but remained standing. For approximately half an hour, Miranda continued to play and function. If the strikes had been of sufficient force to produce fatal injuries, it is unlikely that Miranda would have been able to remain standing or continue functioning and playing as described. Thus, while it is possible that the strikes by Mr. Vasquez were sufficient, on their own, to cause a delayed fatal injury this would be unusual. The effect of the subsequent fall needs to be carefully considered.

3. **The testimony that Miranda's death is similar to those seen in Shaken-Infant Syndrome is false.**

   Shortly after her arrival at the hospital, Miranda was evaluated and treated by Dr. Michael Burke, a neurosurgeon. Dr. Burke further testified that Miranda's injuries resembled Shaken-Infant Syndrome, which according to him is similar to Miranda having been ejected from a car at 65 miles per hour.

2

That testimony is false. It is based on hypothesis and has not been supported by scientific evidence[1].

In addition, nothing about the theory of Shaken-Infant Syndrome leading to lethal outcome can be applied to this situation, where the victim is a four year old, while shaken baby syndrome is most commonly applied to babies under one year of age. There were no bruises, rib fractures and grip marks which would have resulted from the firm gripping necessary to hold and shake a child of this age and size.

The use of this analogy to describe the injuries to Miranda was unscientific and misleading.

4. **The testimony about the nature of Shaken-Baby Syndrome is false.**

Dr. Burke's testimony about the general nature of Shaken-Infant Syndrome is false. Specifically, his statement that it can be likened to a car accident at 65 mph, is false and unsupported by current scientific views in the forensic community. His testimony does not accurately reflect Duhaime's study.[2] Duhaime demonstrated that model studies could not generate forces thought to be sufficient to cause subdural bleeding by shaking alone. Shaking generated accelerations of 9.2 G while impact of the dummy on to a padded surface generated 380 G and on to a metal bar 489G.

5. **The testimony that Miranda's injuries can be likened to those suffered in a car crash at 65 miles-per-hour is false.**

There is no evidence of Miranda having injuries consistent with a crash at 65 miles per hour. She exhibits none of the fractures or external devastation that is consistent with such an event.

6. **Falls such as the one taken by Miranda from a stool do cause lethal brain injury.**

The fall that Miranda took immediately prior to losing functioning could readily have caused the intracranial injuries observed here, including the swelling of the occipital soft tissues, subgaleal bleeding and unilateral subdural bleeding. Low level falls may cause serious and even fatal

---

[1] Barnes P, F. K., Moran D, Squier W (2012). ""Shaken Baby Syndrome, Abusive Head Trauma and Actual Innocence: Getting It Right" Houston Journal of Health Law & Policy

[2] Duhaime AC, Gennarelli TA, Thibault LE, Bruce DA, Marguilies SS, Wiser R. The shaken baby syndrome: a clinical, pathological, and biomechanical study. J Neurosurg. 1987; 66:409-415.

intracranial injury. There is no scientific basis on which to exclude the fall as the cause of the lethal injuries to Miranda's brain.

7. **Miranda's death was likely the product of Second-Impact Syndrome.**

In my opinion, the circumstances of Miranda's death are most consistent with Second-Impact Syndrome. At the time of Mr. Vasquez's trial, scientific knowledge regarding Second-Impact Syndrome was undeveloped. The first case studies attempting to clarify the pathophysiology of Second-Impact Syndrome were published in 2006[3] and 2010,[4] and it was not until that time that the concept gained traction in the scientific community.

In cases of Second-Impact Syndrome, an initial head injury leaves a person with relatively mild-trauma indicated by a subdural hematoma. Ordinarily this injury is not lethal, and without further injuries the individual is likely to recover fully. Fatalities from this sort of injury are exceedingly rare. When such injuries are followed by a second impact before the first has had time to fully heal, the individual can suffer far more devastating injuries than were caused by the first injury. In cases involving Second Impact Syndrome, the second impact need not be severe; relatively minor impacts can cause catastrophic injuries.

Here, there is evidence of both a first and a second impact under circumstances that are consistent with Second Impact Syndrome. In cases involving Second Impact Syndrome, it is common for the first impact to leave the individual dazed. After Richard struck Miranda, she was dazed but able to continue walking and playing. At that stage, it is possible that Miranda suffered a thin subdural haematoma, which, if not exacerbated by a second impact, would almost certainly have not been fatal. If that is the case, however, a second injury, like Miranda's fall from the stool, could have easily caused the sort of injuries that Miranda suffered. Thus, it is my opinion that the subsequent short fall caused the fatal injury to Miranda, not the slaps from Richard.

In addition to the testimony of Richard's having struck Miranda that morning, there is other evidence of a "first impact"; that is, prior head injuries. Multiple, repeated head injuries may have an additive effect, and

---

[3] Mori T. Katayama Y. Katayama T. Acute hemispheric swelling associated with thin subdural hematomas: pathophysiology of repetitive head injury in sports. Acta Neurochir. 2006;96:40–43.

[4] Cantu RC, Gean AD. Second-Impact Syndrome and a Small Subdural Hematoma: An Uncommon Catastrophic Result of Repetitive Head Injury with a Characteristic Imaging Appearance. Journal of Neurotrauma. 2010;27(9):1557-1564. doi:10.1089/neu.2010.1334.

produce more significant damage than a single impact. [5] In my opinion, those strikes may have caused some damage, including the subdural hemorrhage. However, following the strikes described by Richard, her ability to continue to function while dazed suggests a mild concussion, and not anything lethal. If that were the only injury Miranda has suffered, there is no reason to think that she would not have made a full recovery.

It was not until after the impact when she fell from the stool that she exhibited the symptoms of catastrophic trauma to the brain.

All of the features associated with Second Impact Syndrome are evident in the reports about Miranda, including her immediate lapse into a coma after her fall, and the remarkably disproportionate swelling in her brain associated with a thin subdural, which was noted by Dr. Burke.

8.  **Relevant scientific evidence now exists that was unavailable at the time of Mr. Vasquez's trial.**

As indicated above, it is my professional opinion, based on my education, my experience, and my review of the records identified above, that relevant scientific evidence is currently available and was not available at the time of Mr. Vasquez's 1999 trial because the evidence was not ascertainable through the exercise of reasonable diligence by Mr. Vasquez or his counsel before the date of or during Mr. Vasquez's trial. Specifically, the scientific knowledge regarding short falls, Shaken-Infant Syndrome, and Second-Impact Syndrome has changed significantly since the time of Mr. Vasquez's trial and the studies I have relied upon had not been published at the time of his trial.

Accordingly, it is my opinion that Second-Impact Syndrome explains Miranda's death. More specifically, based on my review of the evidence, it is my opinion that the fall from the stool, coupled with a prior head injury, was the cause of Miranda's death.

Executed in Oxford, England on April 12th, 2015.

Dr. Waney Squier MBCHB FRCP FRCPath
Consultant Neuropathologist Honorary Clinical Lecturer

---

[5] Prins ML, Alexander D, Giza CC, et al. Repeated mild traumatic brain injury: mechanisms of cerebral vulnerability. J Neurotrauma 2013;30:30–8.

5

# CURRICULUM VITAE

## WANEY (MARIAN VALERIE) SQUIER

Department of Neuropathology

Level One

West Wing

John Radcliffe Hospital

OXFORD OX3 9DU

Tel 01865-234932

Fax 01865-231157

e-mail waney.squier@ndcn.ox.ac.uk

I am Dr Waney Squier, Consultant Neuropathologist to the Oxford Radcliffe Hospitals and Honorary Clinical lecturer in the University of Oxford. I have been a consultant neuropathologist since 1984, having trained at the Institute of Psychiatry and Great Ormond Street Hospital for Sick Children.

I am a member of the British Neuropathological Society and the British Paediatric Neurology Association. I was elected a Fellow of the Royal College of Physicians following membership by examination in Paediatrics. I am a Fellow of the Royal College of Pathologists.

During my 31 years in Oxford I have specialised in the pathology of the developing brain in the fetus, neonate and chlid. My other areas of interest are developmental causes of epilepsy and muscle pathology. I have been involved in research into the nature and timing of brain damage due to intrauterine and perinatal insults, the effects of asphyxia on the immature brain, correlation of imaging and anatomic pathology in the pre-term human brain, the neuropathology of cerebral palsy in children and the origins, causes and effects of dural bleeding in the infant. I have published widely on these subjects in peer reviewed journals and have edited a book on the timing and causation of developmental brain damage. I have an interest in the neuropathology of sudden unexpected death in infancy, including babies thought to have been intentionally injured. I have prepared reports in many cases both for the prosecution and the defence and have appeared in Court as an expert witness on many occasions.

I have been appointed an expert neuropathologist to the Northern Ireland Public Inquiry into Hyponatraemia Related Deaths (2011).

I became an Associate Member of Centre for Humanities Engaging Science and Society, Department of Philosophy, Durham University- by invitation May 2014

I was nominated for an Honorary Doctorate at the Vrije Universiteit (Free University) of Brussels, September 2014

## MEDICAL SCHOOL:

Leeds University 1966 - 1972

## DEGREES AND QUALIFICATIONS:

1969 BSc (Honours) Anatomy Class II i

1972 MB ChB (Honours) with distinctions in Anatomy, Physiology, Pathology and Medicine

1974 MRCP (UK) (Paediatrics)

1981 MRCPath (Histopathology)

1992 FRCPath London

2003 FRCP London

## AWARDS :

1968 Pearce Prize in Neurophysiology

1968 University Senior Scholarship

1972 West Riding Panel Practitioners Prize

1972 University Gold Medal (William Hey Medal)

## PRESENT APPOINTMENT :

Consultant Neuropathologist  to the Oxford University Radcliffe Hospitals, Oxford since May 1984.

Honorary Clinical Lecturer, University of Oxford.

Consultant in charge of Department from 1989 - l990 and 1999 - 2004.

In my current post I undertake all Paediatric Neuropathology for the Oxford region with many referrals from other regions both in the UK and abroad. I examine some 80-120 baby brains per annum including fetal and neonatal deaths, paediatric deaths from natural causes and unexpected deaths in

infancy. About 5-10% of these cases are examined either at the request of the police or are second examinations for the defence.

**PREVIOUS APPOINTMENTS:**

August 1972-February 1973 House Officer in General Surgery, St James Hospital, Leeds

February 1973-August 1973 House Officer in General Medicine, Professorial Unit, Bristol Royal Infirmary

August 1973-February 1974 Senior House Officer in Paediatrics, Royal Cornwall Hospital

August 1974-February 1975 Senior House Officer in Neonatal Paediatrics, Southmead Hospital Bristol

February 1975-February 1976 Supernumerary Registrar in Neuropathology, Frenchay Hospital Bristol

February 1976-February 1977 Senior House Officer in Morbid Anatomy, Royal London Hospital

February 1977-February 1978: Senior Registrar in Neuropathology Institute of Psychiatry London

March 1978-April 1980: Senior Registrar in Paediatric Pathology Great Ormond Street Hospital and Clinical Lecturer in Histopathology Institute of Child Health London

May 1980-June 1982:   Research Lecturer in Histopathology Institute of Child Health London

**SOCIETIES:**

Member British Neuropathological Society

Member Societe Francaise de Neuropathologie Until 2012

Member British Paediatric Neurology Association

Member International Brain Mechanics and Trauma Laboratory: By invitation 2014

**ACADEMIC:**

I participate in teaching and research in the University of Oxford.

I have given many invited lectures in the UK and abroad as detailed below.

## CURRENT RESEARCH

*Principal Investigator: Current research projects*

- Aquaporin expression in response to hypoxia, ischaemia and trauma in the infant brain

- Neuropeptide expression in brain trauma; the effects of dural bleeding

- The microscopic sites of origin of bleeding within the dura in infants

- Subdural haemorrhage and trigeminal nerve sensitisation in infants and children

- Dural bleeding and venous thrombosis

*PhD co-supervisor, University of Oxford 2011-2014:*

- A Clinico-Pathological Study of Inclusion Body Myositis

*External Supervisor Master Biomedical Science, University of Amsterdam 2011:*

- A topographical, morphological and literature study on the existence and function of the so-called intradural spaces.

*Principal Investigator:* Recent Final Honours student projects:

- Patterns of tissue calcification in the developing brain 2012-2013

- Immunocytochemical study of the innervation of the human dura; changes with gender, age and subdural bleeding 2009-2010

- Identification of neural density in the human dura 2009-2010

- Sites of origin of bleeding in the human dura 2009-1010

- Audit of endothelial markers in the human brain 2009-2010

- Mast cells in the human dura changes with age and subdural bleeding-2010-11

- Effects of site of intracranial blood on brain swelling 2011-12

- Effects of trauma on neuropeptide expression in the human brain 2011-12

- Aquaporin expression in the human dura 2009-10

- Aquaporin expression in response to ischaemia in the infant brain dura 2009-10

I review scientific papers for several major journals including Forensic Science International, Paediatric and Developmental Pathology, Acta Paediatrica, Clinical Neuropathology, Neurogenetics, Neuromuscular Disorders, The Anatomical Record and Acta Neuropathologica

## MEDICO-LEGAL WORK:

I have prepared reports and/or given evidence in court for over 160 cases. These have been in criminal, family and civil cases. I prepare reports for both prosecution and defence.

I have been involved in high profile cases including R-v-Harris in the Court of Appeal 2005 and R-v-Holdsworth 2008 (both for the appellant) and R-v-Patel 2003 and R-v-Henderson 2007 (both for the prosecution).

I have been an invited lecturer to the Family Law Bar Association, the Association of Personal Injury Lawyers, Action against Medical Accidents and the Women Barrister's Society London. I have lectured at conferences on Child Abuse, including Jackson Hole Wyoming (2009), New York (2012), Burlington, Vermont (2013), Plano Texas (2013), and Uppsala Sweden (2014) and to individual lawyer's Chambers (Furnivals, London; Bache and Co, Salisbury).

I have given evidence in Criminal Court in Hong Kong and the Swedish High Court, in Canada, New Zealand, Israel and the USA. I have also prepared reports for cases in Australia, Holland, Germany, Sweden, Iceland, Switzerland and Hong Kong.

## PUBLICATIONS, PAPERS AND COMMUNICATIONS:

### 1) Peer –Reviewed Scientific papers

1. Herson RN, Squier M. Retinal perivasculitis with neurological involvement. A case report with pathological findings. J.Neurol.Sci. 1978; 36: 111-117.
2. Parfrey PS, Squier M. Thalassaemia minor, iron overload, and hepatoma. Br.Med.J. 1978; 1: 416.
3. Topley JM, Benson J, Squier MV, Chessells JM. Hepatotoxicity in the treatment of acute lymphoblastic leukaemia. Med.Pediatr.Oncol. 1979; 7: 393-399.
4. Squier M. Immunochemical Demonstration of Collagen Types in Human Tissues. Proc Roy Microscop Society 1980; 15: 113.
5. Squier M. Immunochemical Demonstration of Collagen Types in Human Tissues in vivo and in vitro. Neuropathol.Appl.Neurobiol. 1981; 7: 83.

6. Harvey W, Squier MV, Duance VC, Pritchard J. A biochemical and immunohistological study of collagen synthesis in Ewing's tumour. Br.J.Cancer 1982; 46: 848-855.

7. Squier M. Immunofluorescent Localisation of Collagens. Neuropathol.Appl.Neurobiol. 1983; 9: 334.

8. Hallam NF, Eglin RP, Holland P, Bell EJ, Squier MV. Fatal Coxsackie B meningoencephalitis diagnosed by serology and in-situ nucleic acid hybridisation. Lancet 1986; 2: 1213-1214.

9. Hayes DJ, Taylor DJ, Bore PJ et al. An unusual metabolic myopathy: a malate-aspartate shuttle defect. J.Neurol.Sci. 1987; 82: 27-39.

10. Matthews WB, Squier MV. Sensory perineuritis. J.Neurol.Neurosurg.Psychiatry 1988; 51: 473-475.

11. Donaghy M, Gray JA, Squier W et al. Recurrent Guillain-Barre syndrome after multiple exposures to cytomegalovirus. Am.J.Med. 1989; 87: 339-341.

12. Esiri MM, Reading MC, Squier MV, Hughes JT. Immunocytochemical characterization of the macrophage and lymphocyte infiltrate in the brain in six cases of human encephalitis of varied aetiology. Neuropathol.Appl.Neurobiol. 1989; 15: 289-305.

13. Squier M, Keeling J. Prenatal Brain Injury. Rev.Neurologique 1990.

14. Squier W, Hope PL, Lindenbaum RH. Neocerebellar hypoplasia in a neonate following intra-uterine exposure to anticonvulsants. Dev.Med.Child Neurol. 1990; 32: 737-742.

15. Squier M, Keeling JW. The incidence of prenatal brain injury. Neuropathol.Appl.Neurobiol. 1991; 17: 29-38.

16. Squier M, Chalk C, Hilton-Jones D, Mills KR, Newsom-Davis J. Type 2 fiber predominance in Lambert-Eaton myasthenic syndrome. Muscle Nerve 1991; 14: 625-632.

17. Land JM, Mistry S, Squier W, Hope P, Orford M, Saggerson ED. Neonatal carnitine palmitoyltransferase deficiency: a case with a muscular presentation. Prog.Clin.Biol.Res. 1992; 375: 309-315.

18. Squier MV, Thompson J, Rajgopalan B. Case report: neuropathology of methyl bromide intoxication [see comments]. Neuropathol.Appl.Neurobiol. 1992; 18: 579-584.

19. Young ID, McKeever PA, Squier MV, Grant J. Lethal olivopontoneocerebellar hypoplasia with dysmorphic features in sibs. J.Med.Genet. 1992; 29: 733-735.

20. Matthews P, Marchington D, Squier M, Land J, et al. Molecular Genetic Characterization of an X-linked form of Leigh's Syndrome. Ann.Neurol. 1993; 33: 652-655.

21. Panegyres PK, Squier M, Mills KR, Newsom-Davis J. Acute myopathy associated with large parenteral dose of corticosteroid in myasthenia gravis. J.Neurol.Neurosurg.Psychiatry 1993; 56: 702-704.

22. Squier MV. Fetal type II lissencephaly: a case report. Childs Nerv.Syst. 1993; 9: 400-402.

23. Squier MV. Development of the cortical dysplasia of type II lissencephaly. Neuropathol.Appl.Neurobiol. 1993; 19: 209-213.

24. Ferrer I, Tortosa A, Macaya A *et al*. Evidence of nuclear DNA fragmentation following hypoxia-ischemia in the infant rat brain, and transient forebrain ischemia in the adult gerbil. Brain Pathol. 1994; 4: 115-122.

25. Gaffney G, Flavell V, Johnson A, Squier M, Sellers S. Cerebral palsy and neonatal encephalopathy. Arch.Dis.Child Fetal Neonatal Ed 1994; 70: F195-F200.

26. Gaffney G, Squier MV, Johnson A. Fetal intracranial haemorrhage: clinical significance of in vitro ultrasonographic diagnosis. Br.J.Obstet.Gynaecol. 1994; 101: 557.

27. Gaffney G, Sellers S, Flavell V, Squier M, Johnson A. Case-control study of intrapartum care, cerebral palsy, and perinatal death. BMJ 1994; 308: 743-750.

28. Gaffney G, Squier MV, Johnson A, Flavell V, Sellers S. Clinical associations of prenatal ischaemic white matter injury. Arch.Dis.Child Fetal Neonatal Ed 1994; 70: F101-F106.

29. Matthews PM, Nagy Z, Brown GK, Land J, Squier MV. Isolated capillary proliferation in Leigh's syndrome. Clin.Neuropathol. 1994; 13: 139-141.

30. Mehmet H, Yue X, Squier M, Edwards A. The Relationship between Cerebral Energy Metabolism and Programmed Cell Death in Newborn Piglets following Transient Hypoxia-Ischaemia. Brain Pathology 1994; 4: 401.

31. Mehmet H, Yue X, Squier MV, Edwards AD. The relationship between impaired cerebral energy metabolism and apoptosis in the cingulate gyrus of newborn piglets following transient hypoxia-ischaemia. UCL/RPMS Perinatal Brain Research Group. Biochem.Soc.Trans. 1994; 22: 421S.

32. Mehmet H, Yue X, Squier MV *et al*. Increased apoptosis in the cingulate sulcus of newborn piglets following transient hypoxia-ischaemia is related to the degree of high energy phosphate depletion during the insult. Neurosci.Lett. 1994; 181: 121-125.

33. Renowden SA, Squier M. Unusual magnetic resonance and neuropathological findings in hemimegalencephaly: report of a case following hemispherectomy. Dev.Med.Child Neurol. 1994; 36: 357-361.

34. Squier MV, Lehr RP. Post-traumatic syringomyelia. J.Neurol.Neurosurg.Psychiatry 1994; 57: 1095-1098.

35. Edwards AD, Yue X, Squier MV *et al*. Specific inhibition of apoptosis after cerebral hypoxia-ischaemia by moderate post-insult hypothermia. Biochem.Biophys.Res.Commun. 1995; 217: 1193-1199.

36. Gaffney G, Flavell V, Johnson A, Squier MV, Sellers S. Model to identify potentially preventable cerebral palsy of intrapartum origin. Arch.Dis.Child Fetal Neonatal Ed 1995; 73: F106-F108.

37. Land JM, Mistry S, Squier M *et al* . Neonatal carnitine palmitoyltransferase-2 deficiency: a case presenting with myopathy. Neuromuscul.Disord. 1995; 5: 129-137.

38. Matthews PM, Benjamin D, Van B, I *et al*. Muscle X-inactivation patterns and dystrophin expression in Duchenne muscular dystrophy carriers. Neuromuscul.Disord. 1995; 5: 209-220.

39. Matthews PM, Squier MV, Chalk C, Donaghy M. Mitochondrial abnormalities are not invariably present in neurologic syndromes associated with multiple symmetric lipomatosis. Neurology 1995; 45: 197-198.

40. Sherriff FE, Joachim CL, Squier MV, Esiri MM. Ubiquitinated inclusions in inclusion-body myositis patients are immunoreactive for cathepsin D but not beta-amyloid. Neurosci.Lett. 1995; 194: 37-40.

41. Bowen J, Gregory R, Squier M, Donaghy M. The post-irradiation lower motor neuron syndrome neuronopathy or radiculopathy? Brain 1996; 119 ( Pt 5): 1429-1439.

42. Brown GK, Squier MV. Neuropathology and pathogenesis of mitochondrial diseases. J.Inherit.Metab Dis. 1996; 19: 553-572.

43. Murphy DJ, Squier MV, Hope PL, Sellers S, Johnson A. Clinical associations and time of onset of cerebral white matter damage in very preterm babies. Arch.Dis.Child Fetal Neonatal Ed 1996; 75: F27-F32.

44. Squier M. Symposium:  Recent advances in Fetal and Neonatal Neuropathology.  Introduction. Neuropathol.Appl.Neurobiol. 1996; 22: 482-503.

45. Squier M. The timing of asphyxial brain damage.  Invited review. Clinical Risk 1996; 2: 37-42.

46. Yue X, Mehmet H, Penrice J *et al*. Modes of cell death in the newborn piglet brain following transient cerebral hypoxia-ischaemia. Neuropath and Applied Neuropathology 1996; 22: 482-503.

47. Blackshear PJ, Silver J, Nairn AC *et al*. Widespread neuronal ectopia associated with secondary defects in cerebrocortical chondroitin sulfate proteoglycans and basal lamina in MARCKS-deficient mice. Exp.Neurol. 1997; 145: 46-61.

48. Edwards AD, Yue X, Cox P *et al*. Apoptosis in the brains of infants suffering intrauterine cerebral injury. Pediatr.Res. 1997; 42: 684-689.

49. Hanna MG, Vaughan JR, Silburn PA *et al*. Two unusual clinical presentations of the mitochondrial DNA A3243G point mutation in adult neurological practice. J.Neurol.Neurosurg.Psychiatry 1997; 62: 544-546.

50.  Metzinger L, Blake DJ, Squier MV *et al*. Dystrobrevin deficiency at the sarcolemma of patients with muscular dystrophy. Hum.Mol.Genet. 1997; 6: 1185-1191.

51.  Nicholson SC, Squier M, Ferguson DJ, Nagy Z, Westaby S, Evans RD. Effect of desferrioxamine cardioplegia on ischemia-reperfusion injury in isolated rat heart. Ann.Thorac.Surg. 1997; 63: 1003-1011.

52.  Oxbury S, Oxbury J, Renowden S, Squier M, Carpenter K. Severe Amnesia:  An unusual late complication after temporal lobectomy. Neuropsychologia 1997; 35: 975-988

53.  Squier M. Pathological approach to the diagnosis of hydrocephalus. J.Clin.Pathol. 1997; 50: 181-186.

54.  Yue X, Mehmet H, Penrice J *et al*. Apoptosis and necrosis in the newborn piglet brain following transient cerebral hypoxia-ischaemia. Neuropathol.Appl.Neurobiol. 1997; 23: 16-25.

55.  Lodi R, Taylor DJ, Tabrizi SJ *et al*. Normal in vivo skeletal muscle oxidative metabolism in sporadic inclusion body myositis assessed by 31P-magnetic resonance spectroscopy. Brain 1998; 121 ( Pt 11): 2119-2126.

56.  Mehmet H, Yue X, Penrice J *et al*. Relation of impaired energy metabolism to apoptosis and necrosis following transient cerebral hypoxia-ischaemia. Cell Death.Differ. 1998; 5: 321-329.

57.  Traill Z, Squier M, Anslow P. Brain imaging in neonatal hypoglycaemia. Arch.Dis.Child Fetal Neonatal Ed 1998; 79: F145-F147.

58.  Felderhoff-Mueser U, Rutherford MA, Squier WV *et al*. Relationship between MR imaging and histopathologic findings of the brain in extremely sick preterm infants. AJNR Am.J.Neuroradiol. 1999; 20: 1349-1357.

59.  Hannan AJ, Servotte S, Katsnelson A et al. Characterization of nodular neuronal heterotopia in children. Brain 1999; 122 ( Pt 2): 219-238.

60.  Li FY, Tariq M, Croxen R *et al*. Mapping of autosomal dominant progressive external ophthalmoplegia to a 7-cM critical region on 10q24. Neurology 1999; 53: 1265-1271.

61.  Sisodiya SM, Heffernan J, Squier MV. Over-expression of P-glycoprotein in malformations of cortical development. Neuroreport 1999; 10: 3437-3441.

62.  Sisodiya SM, Heffernan J, Harrison PJ, Squier MV, Thom M. Sulcogyral variation in NMDA receptor 2A/B subunit immunoreactivity in human brain. Neuroreport 2000; 11: 2601-2606.

63.  Squier M, Chamberlain P, Zaiwalla Z *et al*. Five cases of brain injury following amniocentesis in mid-term pregnancy. Dev.Med.Child Neurol. 2000; 42: 554-560.

64. Bruch LA, Jefferson RJ, Pike MG, Gould SJ, Squier W. Mycoplasma pneumoniae infection, meningoencephalitis, and hemophagocytosis. Pediatr.Neurol. 2001; 25: 67-70.

65. Eriksson SH, Thom M, Heffernan J *et al*. Persistent reelin-expressing Cajal-Retzius cells in polymicrogyria. Brain 2001; 124: 1350-1361.

66. Sisodiya SM, Lin WR, Squier MV, Thom M. Multidrug-resistance protein 1 in focal cortical dysplasia. Lancet 2001; 357: 42-43.

67. Dalakas MC, Vasconcelos OM, Kaminska A *et al*. Desmin myopathy: distinct filamentopathy caused by mutations in the desmin gene. Acta Myologica 2002; 21: 138-143.

68. Polizzi A, Coghill S, McShane MA, Squier W. Acute ataxia complicating Langherans cell histiocytosis. Arch.Dis.Child 2002; 86: 130-131.

69. Sisodiya SM, Lin WR, Harding BN, Squier MV, Thom M. Drug resistance in epilepsy: expression of drug resistance proteins in common causes of refractory epilepsy. Brain 2002; 125: 22-31.

70. Squier W, Argov Z. Toxic and iatrogenic disorders. In: Karpati G, editor. Structural and Molecular Basis of Skeletal Muscle Diseases. Basel: ISN Neuropath Press, 2002: 246-9.

71. Dagvadorj A, Goudeau B, Hilton-Jones D *et al*. Respiratory insufficiency in desminopathy patients caused by introduction of proline residues in desmin c-terminal alpha-helical segment. Muscle Nerve 2003; 27: 669-675.

72. Squier W, Salisbury H, Sisodiya S. Stroke in the developing brain and intractable epilepsy: effect of timing on hippocampal sclerosis. Dev.Med.Child Neurol. 2003; 45: 580-585.

73. Benveniste O, Squier W, Boyer O, Hilton-Jones D, Herson S. [Pathogenesis of primary inflammatory myopathies.]. Presse Med. 2004; 33: 1444-1450.

74. Brazier M, Squier W, Duyckaerts C, Seilhean D, Hauw JJ, Adamson R. The Human Tissue Bill. Lancet Neurol. 2004; 3: 685-690.

75. Squier W. The Human Tissue Bill: the death of pathology? Dev.Med.Child Neurol. 2004; 46: 572-575.

76. Squier W, Cowan FM. The value of autopsy in determining the cause of failure to respond to resuscitation at birth. Semin.Neonatol. 2004; 9: 331-345.

77. Wieck G, Leventer RJ, Squier WM et al. Periventricular nodular heterotopia with overlying polymicrogyria. Brain 2005; 128: 2811-2821.

78. Forman M, Squier W, Dobyns W, Golden J Genotypically Defined Lissencephalies Show distinct Pathologies J Neuropath Expl Neurology 2005 64; 847-857

79. Rutty GN, Squier WM, Padfield CJ. Epidural haemorrhage of the cervical spinal cord: a post-mortem artefact? Neuropathol Appl Neurobiol. 2005 Jun;31(3):247-57

80. Thom M, Martinian L, Sen A, Squier W, Harding BN, Cross JH, Harkness W, McEvoy A, Sisodiya SM. An investigation of the expression of G1-phase cell cycle proteins in focal cortical dysplasia type IIB. J Neuropathol Exp Neurol. 2007 Nov;66(11):1045-55.

81. Nowak KJ, Sewry CA, Navarro C, Squier W, Reina C, Ricoy JR, Jayawant SS, Childs AM, Dobbie JA, Appleton RE, Mountford RC, Walker KR, Clement S, Barois A, Muntoni F, Romero NB, Laing NG. Nemaline myopathy caused by absence of alpha-skeletal muscle actin. Ann Neurol. 2007 Feb;61(2):175-84.

82. Squier W. Shaken baby syndrome: the quest for evidence. Dev Med Child Neurol. 2008 Jan;50(1):10-4.

83. Muscle haemorrhage in a paraplegic adult with neurofibromatosis type 1 and an associated vasculopathy. Matthews PC, Jeans A, Squier W, Kini U, Byren I, Atkins BL. Am J Med Genet A. 2008 Sep 15;146A(18):2424-6.

84. Respiratory function during infancy in survivors of the INNOVO trial. Hoo AF, Beardsmore CS, Castle RA, Ranganathan SC, Tomlin K, Field D, Elbourne D, Stocks J; INNOVO Trial Collaborating Group. Pediatr Pulmonol. 2009 Feb;44(2):155-61.

85. Band-like intracranial calcification polymicrogyria: a distinct "pseudo-TORCH" phenotype.-with simplified gyration. Briggs TA, Wolf NI, D'Arrigo S, Ebinger F, Harting I, Dobyns WB, Livingston JH, Rice GI, Crooks D, Rowland-Hill CA, Squier W, Stoodley N, Pilz DT, Crow YJ. Am J Med Genet A. 2008 Dec 15;146A(24):3173-80. PMID: 19012351

86. Squier W, Mack J. The neuropathology of infant subdural haemorrhage. Forensic Sci Int. 2009 May 30;187(1-3):6-13.

87. Reduced limbic connections may contraindicate subgenual cingulate deep brain stimulation for intractable depression. McNab JA, Voets NL, Jenkinson N, Squier W, Miller KL, Goodwin GM, Aziz TZ. J Neurosurg. 2009 Mar 13;

88. Anatomy and development of the meninges: implications for subdural collections and CSF circulation. Mack J, Squier W, Eastman JT. Pediatr Radiol. 2009 Mar;39(3):200-10. Epub 2009 Jan 23.

89. Respiratory function during infancy in survivors of the INNOVO trial. Hoo AF, Beardsmore CS, Castle RA, Ranganathan SC, Tomlin K, Field D, Elbourne D, Stocks J; INNOVO Trial Collaborating Group. Pediatr Pulmonol. 2009 Feb;44(2):155-61.

90. A spectrum of unusual neuroimaging findings in patients with suspected Sturge-Weber syndrome. Adams ME, Aylett SE, Squier W, Chong W. AJNR Am J Neuroradiol. 2009 Feb;30(2):276-81. Epub 2008 Dec 2.

91. Squier W, Lindberg E, Mack J, Darby S. Demonstration of fluid channels in human dura and their relationship to age and intradural bleeding.Childs Nerv Syst. 2009 Apr 10; [Epub ahead of print.

92. Martinian L, Boer K, Middeldorp J, Hol EM, Sisodiya SM, Squier W, et al. Expression patterns of glial fibrillary acidic protein (GFAP)-delta in epilepsy-associated lesional pathologies. Neuropathol Appl Neurobiol 2009 Aug;35(4):394-405.

93. Srikandarajah N, Martinian L, Sisodiya SM, Squier W, Blumcke I, Aronica E, et al. Doublecortin expression in focal cortical dysplasia in epilepsy. Epilepsia 2009 Jul 2.

94. 'Non-accidental brain injury: mechanisms and imponderables'.Squier W.Dev Med Child Neurol. 2010 Feb;52(2):219. Epub 2009 Nov 30

95. The application of cortical layer markers in the evaluation of cortical dysplasias in epilepsy.Hadjivassiliou G, Martinian L, Squier W, Blumcke I, Aronica E, Sisodiya SM, Thom M. Acta Neuropathol. 2010 Apr 22. [Epub ahead of print]PMID: 20411268

96. Squier W, Jansen A. Abnormal development of the human cerebral cortex. J Anat. 2010;217(4):312-23 Invited Review.

97. Recessive Mutations in the Gene Encoding the Tight Junction Protein Occludin Cause Band-like Calcification with Simplified Gyration and Polymicrogyria.O'Driscoll MC, Daly SB, Urquhart JE, Black GC, Pilz DT, Brockmann K, McEntagart M, Abdel-Salam G, Zaki M, Wolf NI, Ladda RL, Sell S, D'Arrigo S, Squier W, Dobyns WB, Livingston JH, Crow YJ.Am J Hum Genet. 2010 Sep 10;87(3):354-64. Epub 2010 Aug 19.PMID:

98. Squier W, Austin T, Anslow P, Weller RO. Infant subcortical cystic leucomalacia: A distinct pathological entity resulting from impaired fluid handling. Early Hum Dev 2011 Apr 7.

99. Ackers R, Besag FM, Hughes E, Squier W, Murray ML, Wong IC. Mortality Rates and Causes of Death in Children with Epilepsy Prescribing Practice Research Database. Drug Saf 2011 May 1;34(5):403-13.

100. Squier W, Scheimberg I, Smith C. Spinal nerve root beta-APP staining in infants is not a reliable indicator of trauma. Forensic Sci Int. 2011 May 25.

101. Squier W. The triad of retinal haemorrhage, subdural haemorrhage and encephalopathy in an infant unassociated with evidence of physical injury is not the result of shaking, but is most likely to have been caused by a natural disease: Yes. J Prim Health Care. 2011;3(2):159-61.

102. Squier 2011 Invited Review "The Neuropathology of Shaken baby Syndrome: Pathology and mechanisms " Acta Neuropathol. 2011 Nov;122(5):519-42. Epub 2011 Sep 24. Review

103. Oculopharyngodistal myopathy--a possible association with cardiomyopathy. Thevathasan W, Squier W, MacIver DH, Hilton DA, Fathers E, Hilton-Jones D.Neuromuscul Disord. 2011 Feb;21(2):121-5. Epub 2010 Oct 30.PMID:21041087[PubMed - indexed for MEDLINE]

104. A rapid immunohistochemical test to distinguish congenital myotonic dystrophy from X-linked myotubular myopathy.Sewry CA, Quinlivan RC,

Squier W, Morris GE, Holt I.Neuromuscul Disord. 2012 Mar;22(3):225-30. Epub 2011 Nov 22.

105. Long-term observational study of sporadic inclusion body myositis.Benveniste O, Guiguet M, Freebody J, Dubourg O, Squier W, Maisonobe T, Stojkovic T, Leite MI, Allenbach Y, Herson S, Brady S, Eymard B, Hilton-Jones D. Brain. 2011 Nov;134(Pt 11):3176-84. Epub 2011 Oct 12.

106. Varatharaj A, Mack J, Davidson JR, Gutnikov A, Squier W. Mast cells in the human dura: effects of age and dural bleeding. Childs Nerv Syst. 2012 Jan 22.

107. Barnes P, Findley K Moran D, Squier 2012. Shaken baby syndrome, abusive head trauma,and actual innocence: getting it right. Houston Journal of Health Law & PolicyISSN 1534-7907

108. Dobbs T,. Barber Z Squier,W Green A 2012. Cerebral venous sinus thrombosis complicating traumatic head injury Journal of Clinical Neuroscience 2012. J Clin Neurosci (2012), http://dx.doi.org/10.1016/j.jocn.2012.01.002

109. Cohen, M. C., I. Karaman, et al. (2012). "Recurrent pseudo-TORCH appearances of the brain presenting as "Dandy-Walker" malformation." Pediatric and developmental pathology: 15(1): 45-49.

110. Squier W, Mack J, Green A, Aziz T. (2012) The pathophysiology of brain swelling associated with subdural hemorrhage: the role of the trigeminovascular system. Childs Nerv Syst. DOI 10.1007/s00381-012-1870-1

111. Nemaline myopathy with stiffness and hypertonia associated with an ACTA1 mutation. Jain RK, Jayawant S, Squier W, Muntoni F, Sewry CA, Manzur A, Quinlivan R, Lillis S, Jungbluth H, Sparrow JC, Ravenscroft G, Nowak KJ, Memo M, Marston SB, Laing NG.Neurology. 2012 Apr 3;78(14):1100-3. Epub 2012 Mar 21.

112. Developmental changes in human dural innervation.Davidson JR, Mack J, Gutnikova A, Varatharaj A, Darby S, Squier W.Childs Nerv Syst. 2012 May;28(5):665-71.Epub 2012 Mar 7.

113. Peritrigonal and temporo-occipital heterotopia with corpus callosum and cerebellar dysgenesis.Pisano T, Barkovich AJ, Leventer RJ, Squier W, Scheffer IE, Parrini E, Blaser S, Marini C, Robertson S, Tortorella G, Rosenow F, Thomas P, McGillivray G, Andermann E, Andermann F, Berkovic SF, Dobyns WB, Guerrini R.Neurology. 2012 Sep 18;79(12):1244-51. doi: 10.1212/WNL.0b013e31826aac88. Epub 2012 Aug 22.

114. Congenital Toxoplasmosis: Continued Parasite Proliferation in the Fetal Brain Despite Maternal Immunological Control in Other Tissues.Ferguson DJ, Bowker C, Jeffery KJ, Chamberlain P, Squier W.Clin Infect Dis. 2012 Nov 9. [Epub ahead of print]

115. Waney Squier and Anna Jansen Polymicrogyria: pathology, fetal origins and mechanisms Acta Neuropathologica Communications 2014, 2:80 (22 July 2014)
116. Clinical assessment determines the diagnosis of inclusion body myositis independently of pathological features.Brady S, Squier W, Hilton-Jones D.J Neurol Neurosurg Psychiatry. 2013 Jul 16. [Epub ahead of print]
117. "Shaken baby syndrome" and forensic pathology Waney Squier 2014 Forensic Sci Med Pathol DOI 10.1007/s12024-014-9533-z
118. MacCartney E, Squier W (2014) Patterns and pathways of calcification in the developing brain  Dev Med Child Neurology Oct;56(10):1009-15. doi: 10.1111/dmcn.12493.
119. Geetha Anand, Ravindran Visagan, Saleel Chandratre, Shelley Segal, Andrea H Nemeth, Waney Squier, Fintan Sheerin, Derek Neilson, Sandeep Jayawant 2014  Pediatric Infectious Disease Journal 2014 H1N1 Triggered Recurrent Acute Necrotizing Encephalopathy in a Family with a T653I Mutation in the RANBP2 Gene

120. Alain Goriely, Marc G.D. Geers, Gerhard A. Holzapfel, Jayaratnam Jayamohan, Antoine Jerusalem, Sivabal Sivaloganathan, Waney Squier, Johannes A.W. van Dommelen, Sarah Waters, Ellen Kuhl. 2015 "Mechanics of the Brain: Perspectives, Challenges, and Opportunities" in Biomechanics and Modeling in Mechanobiology (BMMB)

## PEER –REVIEWED ABSTRACTS OF PRESENTATIONS TO SCIENTIFIC CONGRESSES

1. Squier M. Immunofluorescent Demonstration of Specific Collagen Types in Cultured Muscle Cells. Abstracts VI Int.Histo.& Cytochem.Congress August 1980; 357.
2. Harvey W, Light N, Duance V, Squier M. The Collagen of Oral Submucous Fibrosis. Brit Soc for Dental Research 1984.
3. Squier, MV. Three Siblings with an Unusual Form of Lissencephaly. Clin.Neuropathol. 7, 212. 1988. Ref Type: Abstract
4. Larroche J, Razavi-Encha F, Squier M. The Lissencephalies:  a large spectrum of morphological abnormalities. Proc.XI International Congress of Neuropathology, Kyoto Sep 2-8 1990.
5. Fetal Brainstem Neoplasia associated with Ipsilateral Cerebellar Dysplasia. Brain Pathol. 4, 393. 1994. Ref Type: Abstract

6.  Mehmet H, Yue X, Squier M, Edwards A. The relationship between impaired cerebral energy metabolism and programmed cell death in the cingulate gyrus of the newborn piglet following transient hypoxia-ischaemia. Poster at a Symposium "Death from inside out: The role of Apoptosis in development, tissue homeostasis and malignancy." The Royal Society, London, February 1994.

7.  Oxbury J, Squier M, Adams C, Zaiwalla Z, et al. Surgical Treatment of Childhood Temporal Lobe Epilepsy due to Dysembryoplastic Neuroepithelial Tumour. Oral Presentation.21st International Epilepsy Congress Sydney, Australia.September 1995.

8.  Oxbury S, Squier M, Renowden S, Carpenter K, Oxbury J. Severe amnesia and hippocampal neurone loss:  a case of unusual late complication after temporal lobectomy with autopsy findings. British Neuropsychology Society 1995.

9.  Squier M, Hannan A, Servotte S, Katsnelson A, Blakemore C, Molnar Z. Characterisation of Subcortical Neuronal Heterotopia in Children with Epilepsy. Poster Presentation Am Soc Neuroscience 1997.

10. Squier, W.  Natural history of subdural haemorrhage in infants: imaging and pathological correlations. (Abstract) Developmental Medicine & Child Neurology 47, 6. 2005.

11. Squier W.  Bleeding from the dura? You must be choking! (Abstract) Dev Med Child  Neurology 2007 49 Supplement 108 p6

12. Squier W, Anslow P, Austin T, Weller R 2008 Subcortical Cystic Leukomalacia    in young infants: a non-traumatic explanation for "subcortical contusions".  Arch Dis childhood. 2008 (Abstract ) (suppl 1)A51-A60

13. Barnes P, Galaznik J, Krasnokutsky M et al. CT in Infant Dysphagic Choking Acute Life Threatening Event (ALTE ? a mimic of child abuse).  Scientific Paper Sessions, Society for Pediatric Radiology, Scottsdale  AZ, May 2008 (Abstract)

14. W. Squier, F. Sheerin Infant cortical vein thrombosis Neuropathology and Applied Neurobiology  2011 British Neuropathological Society, 37 (Suppl. 1), 7–42 Peer reviewed abstract of spoken presentation

15. Squier W Mack J A central role for trigeminal neurogenic inflammation in response to subdural haemorrhage Neuropathology and Applied Neurobiology 2012 38 (Suppl 1)p32 Peer reviewed abstract

16. Sudden unexpected death in children and teenagers with epilepsy: an epidemiological study. Frank MC Besag, Lina Nashef, Ruth Ackers, Elaine Hughes, Waney Squier, Macey L Murray, Ian CK Wong (Abstract)

17. Waney Squier, Fin Sheerin January 2011: Infant cortical vein thrombosis and occlusion British Neuropathology Society Winter Meeting London

18.  MacCartney E Squier W 2014 Dev Med Child Neurology Volume 56, Issue Supplement s1 Pages 1 - 61, January 2014 Histological patterns and pathways of calcification in the developing brain

**PUBLISHED LETTERS, COMMENTARIES ETC:**

1.  Hilton-Jones D, Squier MV. Risk of cancer in dermatomyositis or polymyositis [letter]. N.Engl.J.Med. 1992; 327: 207.
2.  Hilton-Jones D, Squier MV. Dystrophin-associated protein complex: clinical implications [comment]. Lancet 1993; 341: 528-529.
3.  Squier MV, Jalloh S, Hilton-Jones D, Series H. Death after ecstasy ingestion: neuropathological findings [letter]. J.Neurol.Neurosurg.Psychiatry 1995; 58: 756.
4.  Squier W. Addressing the fundamental methods. Arch.Pediatr.Adolesc.Med. 2005; 159: 195.
5.  Squier W, Ironside J.  Falling necropsy rates and risks to public health. Arch Dis Child. 2006 Jul;91(7):551-3.
6.  Squier W.  Shaken baby syndrome: evidence and experts. Dev Med Child Neurol. 2008 Apr;50(4):316-7.
7.  Squier W. Commentary on: Sauvageau A, Bourgault A, Racette S. Cerebral traumatism with a playground rocking toy mimicking shaken baby syndrome. J Forensic Sci 2008;53(2):479-82. J Forensic Sci. 2008 Sep;53(5):1244;
8.  Squier W.  Nonaccidental trauma: clinical aspects and epidemiology of child abuse.  Pediatr Radiol. 2009 Apr 28;
9.  Squier W, Mack J. Microscopic examination of grossly unremarkable pediatric dura. Am J Forensic Med Pathol. 2010 Dec;31(4):e11. PubMed PMID: 21063196.
10.  Response to Dr Greeley: "The Evolution of the Child Maltreatment Literature" Waney Squier, Norman Guthkelch, Julie Mack Pediatrics 2012. Published September 27, 2012
11.  Admissibility of shaken baby syndrome/abusive head trauma evidence Keith A. Findley & A. Norman Guthkelch & Patrick D. Barnes & David A. Moran & Waney SquierPediatr Radiol (2013) 43:890 DOI 10.1007/s00247-013-2716-z
12.  Squier W, Mack J 2014 DMCN Letter to Editor in Response to Lingappa[8] et al and DeVeber[3] on the relationship between acute basal ganglia stroke, mineralising angiopathy and minor head trauma

**CHAPTERS:**

1.    Hubbard B, Squier M. The Physical Ageing of the Neuromuscular System. In: Tallis R, editor. The Clinical Neurology of Old Age. New York: John Wiley & Sons Ltd., 1989: 3-26.

2.    Squier M. The Pathology of Neuromuscular Disease in the Elderly. In: Griffiths R, McCarthy S, editors. Degenerative Neurological Disease in the Elderly. Bristol: John Wright, 1987.

3.    Sisodiya S, Squier M, Anslow P. Malformations of Cortical Development. In: Oxbury J, Polkey C, Duchowny M, editors. Intractable Focal Epilepsy. London: WB Saunder, 2000: 99-130.

4.    Sisodiya SM, Squier MV, McShane A, Anslow P. Cortical Dysgenesis. Oxbury, J., Polkey, C. Duchowny, M. Intractable Focal Epilepsy. 1998.

5.    Squier M. Acquired Diseases of the Nervous System. In: Keeling J, editor. Fetal and Neonatal Pathology. London: Springer-Verlag, 1993: 571-93.

6.    Squier M. Acquired Diseases of the Central Nervous System. In: Keeling J, editor. Fetal and Neonatal Pathology. London: Springer-Verlag, 2001: 571-94.

7.    Squier M. Malformations of the Central Nervous System. In: Keeling J, editor. Fetal and Neonatal Pathology. London: Springer-Verlag, 2001.

8.    Squier W. Fetal Cerebral Pathology of Hypoxic-Ischemic Origins. In: Levene MI, Chervenak FA, Whittle M, editors. Fetal and Neonatal Neurology and Neurosurgery. London: Harcourt, 2001: 323-37.

9.    Squier W. Basic Cellular Reactions of the Immature Human Brain. In: Rutherford M, editor. MRI of the Neonatal Brain. London: Saunders, WB, 2002: 85-95.

10.   Squier M. Birth Trauma and its Assessment. In: Busuttil A, Keeling J, editors. Forensic Medicine and Pathology. Arnold, 2003.

11.   Squier W, Cowan FM. The Value of autopsy in determining the cause of failure to respond to resuscitation at birth. In: Keeling JW, Khong TY, editors. Neonatal Autopsy. London: Elsevier, 2004: 331-46.

12.   Squier W. Grey Matter Lesions. In: Golden JA, Harding BN, editors. Pathology & Genetics. Developmental Neuropathology. Basel: ISN Neuropath Press, 2004: 171-5.

13.   Rutty G and Squier W Subdural Hamatoma in Children in Rutty 2006 Essentials of Autopsy Practice. Springer

14.   Squier W, Smith C. Acquired Diseases of the Central Nervous System. In: Keeling J, editor. Fetal and Neonatal Pathology. London: Springer-Verlag, 2008:

15.   Squier W Pathology of neurological abnormality in early life.Chapter 9 2008: In Paediatric Forensic Medicine and Pathology Eds Busuttil A and Keeling JW

16. Squier W 2009 "Shaken Baby Syndrome" In Encyclopedia of Forensic Pathology. Ed Sauko Pekka

17. Squier W The Development of Malformations of the Human Cerebral Cortex. In SHORVON, ANDERMANN & GUERRINI: The Causes of Epilepsy. In Press 2010

18. Squier W 2012 "Retino-dural haemorrhage in Infancy" In Encyclopedia of Forensic Pathology. Ed Sauko Pekka

19. Squier W and Encahvi F. Chapter 10 "The Nervous System" in The Pediatric and Perinatal Autopsy Manual, ed. Marta C. Cohen and Irene Scheimberg. Published by Cambridge University Press 2014.

**BOOKS:**

1. Squier W "Acquired Damage to the Developing Brain: Timing & Causation.". London: Arnold, 2002.

2. Hilton-Jones D, Matthews P, Squier M, Taylor D. "Metabolic Myopathies" for Major Problems in Neurology. WB SAUNDERS, 1995

3. "Friede's Developmental Neuropathology" Textbook in preparation

4. "Atlas of Developmental Neuropathology and Correlative Neuroradiology" In Preparation

**INVITED LECTURES:**

I have been invited to give many individual lectures and to participate as a Course Tutor at many National and International Centres including St Petersburg, Perth, Australia and Adelaide, Australia in the last ten years. The more recent are detailed below.

**2015**

"Perinatal White Matter Disease" Euro-CNS course on White Matter Disease Amsterdam March 2015

**2014**

"Science and Medicine in the Courts" Seminar for Centre for Humanities Engaging Science and Society, Dept Philosophy University of Durham November 2014

Shaken baby Syndrome/ Abusive Head Trauma. Invited lecturer to Swedish Association of Forensic Pathologists September 2014

Neonatal Encephalopathy. Invited Lecture in Neuropathology Symposium at the Joint Meeting of the Paediatric Pathology Society and the Society of Pediatric Pathology 4-6 Sept 2014 Birmingham,

Shaken Baby Syndrome: the uncomfortable interfaces between medicine, science and the law. Invited Lecture to Centre for Humanities Engaging Science and Society at the Department of Philosophy, University of Durham England 2014

"The Trigeminal Nerve and Neurogenic Inflammation; headache, trauma and more." Invited Plenary Lecture Anglo-Dutch Migraine Association London, May 2014

Course Tutor at Euro-CNS training course in Developmental Neuropathology Aachen March 2014 and October 2014

## 2013

Shaken Baby Syndrome: a medical diagnosis of murder. Invited Lecture to Leeds Medico-Legal Society November 2013

Course Tutor at Euro-CNS training course in Forensic Neuropathology Amsterdam October 2013

Lecture Soroptimists Society of Belgium "Shaken Baby Syndrome- Wrongful Accusations?" June 2013

## 2012

March 2012 Research Seminar Forensic Pathology - Faculty of Medicine and Pharmacy Vrije Universiteit Brussels

March 2012 Invited Lecturer Euro-CNS Course Developmental Brain Pathology

March 2012 Royal College of Surgeons of Ireland Invited speaker "An evening with the Pathologists" Dublin

June 2012 Invited Lecturer Euro-CNS Course White Matter Diseases

May 2012 IBBS Research Seminar School of Pharmacy & Biomedical Sciences, University of Portsmouth

May 2012 South of England Neurology Association New insights into the anatomy and function of the meninges and their central role in head injury

Coroners Society Annual Meeting Harrogate September 2012 "Questioning Shaken Baby Syndrome: an Institutional Response to Scientific Uncertainty" *(Presentation withdrawn at request of Chief Coroner)*

October 2012 4th Congress of the European Academy of Paediatric Societies Invited Lecture "Neuropathology of paediatric brain injury"

November 2012 Invited Panelist at Discussion "Wither the Triad?" Family Law Bar Association Annual Conference Winchester UK

## 2011

Invited Lecturer Southern Group of Coroners Society November 2011 "Malice in Wonderland" Advances in our Understanding of Shaken Baby Syndrome"

Invited Panellist 2011 New York City Abusive Head Trauma/Shaken Baby Syndrome Training Conference

Invited Speaker APIL clinical negligence conference 2011 Role of Neuropathology

Invited Tutor European Course in Basic Neuropathology
March 2011, Aachen, Germany

September 2011 The Role of the Neuropathologist in Establishing Causation of Brain Damage. Invited Lecture: Association of Personal Injury Lawyers Annual Conference Chester UK

## 2010

October 2010 IAP Sao Paulo Lecture "Mimics of Child Abuse"

September 2010 European Congress of Pathology Invited Lecture "Development of the Dura".

June 2010 "Neonatal Encephalopathy" Greek Congress of Pathology Thessaloniki Greece

April 2010 Belgian National Pathology Week lecture "Neuropathology of Infant Subdural Haemorrhage"

January; "Human Cortical development" Lecture and Chapter for Anatomical Society of Great Britain. Symposium proceedings, Oxford

## 2009

October: Case Presentation in Muscle Symposium Latin American Society of Paediatric Pathology Antigua, Guatemala

October: "White Matter Disease in the Neonate". Leucoencephalopathy Course, Amsterdam

September: Discussion panel on Infant Head Injury Child Care Law Conference, London

June: "Brain Malformation and Epilepsy" Belgian Society of Neurology and Paediatric Neurology

February: Lecture on Dural Anatomy and fluid handling; Evidence Based Analysis of Infant Brain Trauma Conference. Denver, Colorado

January: British Neuropathology Society Trainees Study Day

Bache &Co Solicitors;    Women Barristers Society

"Paediatric Neuropathology" Paediatric Pathology Teaching Course, Cyprus

2008

October: International Society of Paediatric Neurosurgeons
Infant Non Accidental Head Injury Cape Town

May:  Non-accidental Infant Head Injury
1st International Conference "Violence against Children" Tallinn

March: Lecturer in Developmental Neuropathology. Teaching Course- Euro CNS
Aachen, Germany

2007

October: "Developmental Neuropathology" Developmental Psychology Course,
Charney Bassett, Oxon.

October:  Brain Development and the effects of asphyxia
MSC course. Hammersmith Hospital London.

September:  Asphyxia and the Neonatal Brain
International Congress of Paediatric Pathology Istanbul

September:  Birth Trauma and the brain
International Congress of Paediatric Pathology Istanbul

2006

November:  "SBS New Views"8th Annual medico-legal lecture to Manchester
Medical Society.

September:  "NAI in the Light of the Appeal Court Ruling"
Forensic Neuropathology Symposium.  Royal College of Pathologists

May:  Resident Lecturer in Developmental Neuropathology Paediatric and
Perinatal Course, Ismir, Turkey

May: "Abnormal Prenatal Development of the Human Cerebral Cortex" Lecture to First Doorwerth Conference on Developmental Disorders of Brain, The Netherlands.

April: "Brain Development, Normal and Abnormal Pathology and Imaging Correlations" Child Neuropsychology course, Charney Basset, Oxon.

March: Euro-CNS European Training Course Organiser and Lecturer, Oxford

February: "Neuropathology of Infant Head Injury"University of Stellenbosch, South Africa

January: "How I contribute to the Diagnosis of Child Abuse"
British Paediatric Neurology Association

2005

December: "The Neuropathologist in Court" West of England Neurology Course, Devon.

March : "Developmental Neuropathology" Developmental Psychology Course, Charney Bassett, Oxon.

"Intrauterine Stroke" Lecture to 2 day symposium on Congenital Hemiplegia, London.

2004

December: "Lessons from the Perinatal Autopsy"International Neonatal Study Course Hammersmith Hospital London

November : "Developmental Brain Lesions and Epilepsy" and "Uses of Muscle biopsy" West of England Postgraduate Neurology Course, Devon

October: "Neuropathology of Cerebral Palsy" International Acadamy of Pathology Brisbane

Sept: "Subdural Haemorrhages in Infants" and "Hypoxic-Ischaemic Injury in the Neonatal Brain" S. American Society of Paediatric Pathology Carthagena, Colombia

July: "Classification of Cerebral Palsy" NIH Washington

April: Principal Lecturer on Postgraduate Neurology Course Santiago, Chile

March: "Organ Retention and the future of Pathology" Royal College of Paediatrics and child Health York

Waney Squier

September 2014